UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————————————x

RICHARD ELLO,

                                        Plaintiff,

                                                            **First Amended
                                                            Complaint**
        -v-                                                 Case No.
                                                            05cv9625(KMK)
                                                            **JURY TRIAL
                                                             DEMANDED**

ISHRI SINGH, in his individual and official capacities;
RAYMOND POCINO, Vice President and Eastern Regional
Manager of LABORERS INTERNATIONAL UNION OF
NORTH AMERICA, in his individual and official capacities;
LABORERS INTERNATIONAL UNION OF NORTH
AMERICA; LABORERS-EMPLOYERS COOPERATION AND
EDUCATION TRUST FUND; RAYMOND POCINO, Trustee, in
his individual and official capacities; MASON TENDERS
DISTRICT COUNCIL TRUST FUNDS; JOHN VIRGA, Funds
Director, in his individual and official capacities; "John Doe and
Jane Doe A through D"; the latter being parties unknown to
plaintiff,

                                        Defendants.

——————————————————————————x

Plaintiff, by its attorneys, LAW OFFICES OF RUTH M. POLLACK, as and for its First
Amended Verified Complaint alleges as follows:


                            BACKGROUND


    1.  At all relevant times, plaintiff, Richard Ello, (hereinafter "Ello") resided
        at 477 Remsen Lane, Oyster Bay, New York.

    2.  At all relevant times, Ello was employed by and successfully served
        numerous entities affiliated with the Laborers' International Union of
        North America (hereinafter referred to as "LIUNA") for seventeen (17)
        years.

3.  Between 1988 and 1996 Ello was employed as the Controller of the Mason Tenders District Council of Greater New York (hereinafter referred to as "MTDC").

4.  From 1996 until his constructive termination by defendants on April 1, 2005, Ello was employed as an "International Representative" for LIUNA in a salaried position.

5.  During this period Ello also was elected by the membership as Secretary - Treasurer of LIUNA Local #108.

6.  During this period Ello was appointed and served as "Deputy Supervisor" of Local 108 by the General President of LIUNA to cleanse the Local 108 of corruption.

7.  In or about 1996 until his constructive termination on April 1, 2005 Ello was appointed by the Trustees of the Greater New York Laborers-Employers Cooperation & Education Trust Fund (hereinafter referred to as "LECET") to serve as its Director in a salaried position.

8.  In or about 1995, Ello was also appointed Trustee of Demolition Workers Local #95 to cleanse it of corruption and to restore democratic practices.  The duties of this position included serving as a Trustee on the Local #95 Pension, Health and Annuity Funds.

9.  In or about 1995 Ello was also selected to serve as a Committee Member of the MTDC Political Action Committee.

10. In or about 1998, Ello was selected to serve as an Administrative Committee member of the Laborers' Eastern Region Organizing Fund in Cranbury, NJ.

11. In early September 2004 Ello was chosen to serve as "Deputy Supervisor" of both the MTDC and LIUNA Local #79 to cleanse them of corruption and financial mismanagement.

12. In December 2004 Ello was selected to serve as a Trustee for the LIUNA Local #30 Trust Funds.

13. For many years until his constructive termination, Ello also served as a Trustee for the MTDC Pension, Welfare, Training, Annuity, Scholarship and Staff Pension Plan Trust Funds.

14. At all relevant times, Ello was a participant in the MTDC Pension, Annuity and Welfare Funds, entitling him to all benefits and protections

afforded to all other participants equally.

15. The nature of these positions required Ello's extensive cooperation
    with the Federal Bureau of Investigation, the U.S. Department of
    Labor, the U.S. Department of Justice, the Manhattan District
    Attorney's Office, a court-appointed Monitor and a court-appointed
    Investigations Officer (the latter exclusively for the MTDC and the
    MTDC Trust Funds) and the Inspector General of LIUNA.

16. In his many senior level roles during his seventeen (17) years of
    managerial employment, Ello duly performed his duties in a lawful,
    professional and effective manner.

17. The MTDC generally offered better salary and benefits than did the
    MTDC Trust Funds.

18. On Friday, February 4, 2005 after regular working hours, plaintiff
    proceeded to a restaurant/bar across the street from the MTDC
    Offices, accompanied by LIUNA Local #79 employee George
    Gonzalez  (hereinafter "Gonzalez") who said he wanted to speak to
    plaintiff in his role as "Deputy Supervisor" of Local #79 about an
    attempted robbery that day as well as other office issues.

19. From December 2004 until February 2005, Ishri Singh, (hereinafter
    "Singh") an employee of MTDC Trust Funds (hereinafter "Trust
    Funds") had made repeated verbal requests of Ello, in Ello's capacity
    as MTDC Deputy Supervisor and LECET Director, for MTDC or
    LECET employment.

20. On each occasion, plaintiff was compelled to deny Singh's requests
    for two reasons: 1. budgetary constraints, and 2. MTDC and LECET
    staffs are represented by a LIUNA Local #279 collective bargaining
    agreement which provided that any future job opening would first be
    offered to existing Local #279 members in good standing.

21. Singh was not a Local #279 member in good standing.

22. For between one (1) and two (2) years, Singh frequented plaintiff's
    office   at the MTDC on a nearly daily basis to obtain his signature on
    MTDC Trust Fund checks and other Fund-related documents.

23. During many of these visits Singh would "remind" plaintiff that he
    sought   placement at either the MTDC or the LECET.

24. Upon information and belief, these numerous requests were
    witnessed and/or overheard by Robert Bonanza, the senior

elected Officer of the MTDC, whose office was located adjacent to that of plaintiff Ello.

25. On two (2) of Singh's most recent visits to Ello's office, Singh advised Ello that he had overheard MTDC employee Wendy Urena state that she desired to move to Eastern Long Island and seek employment in that area. He also stated that he had heard Vice President and Eastern Regional Manager Raymond Pocino suggested that plaintiff consider hiring an assistant to ease plaintiff's workload.

26. At a restaurant/bar to which plaintiff Ello and Gonzalez had gone to talk after work hours on February 4, 2005, Singh asked if he could join Ello and Gonzalez. At that time he again asked Ello to inquire about two positions, and he requested that plaintiff nominate him for either the assistant position or the position, which might be vacated by Wendy Urena.

27. At this place and time plaintiff tendered two responses to Singh's requests, neither of which were acceptable to Singh. In regards to Wendy Urena's position, plaintiff had heard her speak about relocating for perhaps one (1) year but she had not done so. Plaintiff speculated that her relocation might never happen and if it did, LIUNA Local #279 members would have preference by contract. As far as filling the potential position as an assistant to plaintiff, Plaintiff Ello stated that he believed the MTDC could not afford an additional salary so it was unlikely that it would happen. In addition, the ideal candidate would have collective bargaining and organizing experience, both of which Singh denied having.

28. Singh responded to Ello that he would be more useful to plaintiff than just a "regular employee", adding that his "family" was in "law enforcement", and he was aware of ways to have "anybody arrested and charged".

29. Plaintiff replied that LIUNA maintains a very active Inspector General's Office, which plaintiff utilized constantly for any problems that surfaced and that he saw no need for outside law enforcement to be involved at the level at which he dealt.

30. Singh then replied that conditions had gotten worse for him working at the MTDC Funds. He stated that, in fact, he could not even show up for work on the previous day, February 3, 2005. He also spoke of having had to file a harassment complaint against Mildred Dealy, a manager at the MTDC Trust Funds.

31. Thereafter, Gonzalez left the bar/restaurant, saying that he had to

deliver mail from plaintiff's office.

32.  Over the course of the conversation about the possible positions discussed between Singh and plaintiff, Singh consumed four or five glasses of red wine, and began to appear somewhat intoxicated to plaintiff.  He walked outside the establishment two (2) times purportedly to accept cellular phone calls, explaining that he was arguing with his wife about being out while he had a sick child at home with chronic vomiting. He claimed to have lost the second call connection. He also said that if the vomiting did not cease, the child might be admitted to Jamaica Hospital in Queens the next day.

33.  Plaintiff stated that he had to leave to make a meeting in Westbury, Long Island that evening.  Singh was, at this time, involved in a conversation with a female bartender, and at one point he was holding her hand/wrist.  Plaintiff, who was not involved in the conversation, overheard her say that she was a Colombia native, at which point Singh replied to her that he was also a South American native.

34. This statement of Singh surprised plaintiff because he recalled him once telling him that he was a Hindu from India.

35. At this time, approximately 7:30 p.m., plaintiff got up to leave, but stated that he would first have to return to his office across the street to retrieve some items and then go.  Singh asked if he could accompany him to use an office telephone and re-call his house, to which plaintiff agreed, out of concern for the child.

36.  At the office, Singh dialed the telephone at MTDC employee Maria Rodriguez' desk.  While Singh was on the telephone, plaintiff went to his office to retrieve his items and then waited by the elevators ready to leave.  He offered to drive Singh home on his way out to Long Island, but Singh stated he might go back to the bar as the female bartender was getting off duty.

37.  Plaintiff, leaving Singh behind, left for the evening and attended the meeting in Westbury.

38. The next business day, Monday, February 7, 2005, the MTDC Trust Fund computer (and e-mail capabilities) crashed for the first time in memory.

39.  Upon information and belief, the video surveillance monitors were not working at the time of the allegations.

40.  On or about the following Tuesday or Wednesday a Trust Fund

employee advised Ello that Ishri Singh had either quit or was fired and that he had witnessed Singh surrendering his building I.D. and being escorted out of the premises.

41.  As a MTDC Funds Trustee, plaintiff telephoned John Virga (hereinafter "Virga"), then "Funds' Director", to ascertain and/or confirm the reason for this personnel change as was plaintiff's responsibility.

42.  Virga came to plaintiff's office and stated that "Ishri" had only gone home with the flu; he would probably return the next day.  Plaintiff later learned that this was false. He also asked John Virga if he was scheduling another Trustee meeting soon, because the one held last week had not gone well and many changes were being contemplated. Virga denied that a meeting was forthcoming, and plaintiff later learned that this statement was also false.

43.  Upon information and belief, a telephonic Trustees' meeting was held that afternoon without plaintiff's knowledge. Minutes of that meeting were never provided to plaintiff. Both of these factors raised possible serious ERISA violations and prevented plaintiff from carrying out his responsibilities.

44.  In the late afternoon of February 9, 2005, plaintiff received a call in his office from New York City Detective Whelan.  He advised plaintiff that Ishri Singh had just filed a complaint against him in which he made certain allegations of harassment, which Singh had purportedly alleged occurred during the prior week.

45.  The allegations made by Singh against Ello were that on February 4, 2005, at about 8:30 p.m. at 520 8th Avenue, New York, New York, he "intentionally, and for no legitimate purpose, forcibly touched the [Singh's] sexual and other intimate parts of another person for the purpose of gratifying the defendant's sexual desire; and that the defendant subjected another person {Singh] to sexual conduct without the latter's consent." These charges were patently false.

46.  Singh also alleged that plaintiff "did intentional, and for no legitimate purpose, forcibly touch [Singh's] sexual or other private parts, for the purpose of degrading or abusing [Singh], and for the purpose of gratifying [plaintiff's] sexual desire, in that the [plaintiff] did grab and squeeze [Singh's] penis through his clothing, and that [plaintiff] did grab [Singh's] hand and place it on [plaintiff's] penis through his clothing…and that [Singh] did not consent to the defendant's touching him in any way. "

47. Defendants related the charges to Trustees and other co-workers of plaintiff and back to plaintiff, knowing or having reason to know that they were patently false, and did cause him humiliation and anguish and damage to his reputation.

48. Plaintiff appeared to answer the false charges, enter a not-guilty plea, and demand a trial by jury, and as a result, suffered damage to his reputation, anguish, humiliation, pain and suffering.

49. Upon first learning of the false charges, plaintiff immediately called his superior, Vice President Raymond M. Pocino (hereinafter "Pocino") and requested a meeting. Pocino advised Ello to meet him in the lobby bar of the Intercontinental Hotel at 6 p.m.

50. Plaintiff arrived on time, and Pocino greeted him by saying that he just completed a MTDC Trust Funds Trustees' telephonic conference. He further stated that he knew all about the harassment complaint, and was directed by the Proskauer Rose law firm not to speak to plaintiff about it. He repeated this at least four (4) times. He further elaborated that plaintiff was now denied access to "any Trust Fund", and was to "stay away" from any Trust Fund employee.

51. Plaintiff replied that this was akin to removing him from his job, without even explaining to Ello what had actually happened and why the action was being taken. Pocino did not respond.

52. Plaintiff further replied that this action violated his rights as a fund participant. Pocino did not respond.

53. Upon information and belief, this action did violate plaintiff's rights as a fund participant because he not only was a beneficiary fund participant because he not only was a beneficiary of he fund as an employee and trustee, but also he was a co-trustee to whom Pocino owed a legal duty to ensure the proper management and operation of the funds.

54. Upon information and belief, Pocino owed a legal duty to Ello as a co-Trustee to cooperate with him to properly manage and operate the trust funds.

55. Upon information and belief, Pocino violated not only his fiduciary duty to plaintiff and to the Trust Fund participants but also state and/or federal law.

56. The MTDC Training Fund, one of the funds in the instant case, is approved, certified, and routinely audited by the State of New York

Department of Labor to operate its own "Apprenticeship Training Program".

57.  In part, this program trains apprentices to become skilled construction craft laborers by being able to offer both classroom and hands-on learning.

58. As part of his official duties, plaintiff met personally with a member of the New York State Department of Labor to learn how to obtain DOL certification for such a program.

59.  The New York State Department of Health certified and approved this Fund to also offer "Asbestos Abatement Training."

60.  The New York State Department of Motor Vehicles and Insurance has certified and approved this Fund to offer a "Defensive Driving Course."

61.  This Fund routinely applies for, and receives, New York State and federal grants to maintain and improve its training.

62.  As a result, the Fund has many significant New York State affiliations, in addition to federal affiliations.

63.  LIUNA, as the parent labor organization to MDTC, held in trusteeship by LIUNA, has been required to submit Semi – Annual Trustee Reports to the United States Department of Labor.

64.  Article IX, Section 7 of the International Union Constitution specifically authorizes imposition of the trusteeship upon LIUNA as the reporting labor organization.

65. Two reasons listed with the United States DOL for the establishment of the trusteeship is "A-To correct corruption or financial malpractice; and B- To assure the performance of collective bargaining agreements or other duties of a bargaining representative."

66. The Fund, and the within defendants as members of the Fund, is, upon information and belief, subject to the laws of the State of New York and the United States of America.

67. As such, defendants herein are, in effect, "state actors" in that the acts complained of herein were taken with the union's imprimatur, constituted a constructive expulsion of plaintiff, affected his membership rights and were imposed upon him to punish him in a retaliatory manner for his past whistle blowing activity. In

addition, the acts complained of were "retrospective in focus" and constituted "the administering of penalties" in excess to the gravity of the past alleged wrong."

68. Pocino closed the conversation by stating that plaintiff would be contacted at home in one (1) or two (2) days by an "independent outside attorney, chosen by Proskauer Rose". This person would interview first, Ishri Singh and then plaintiff, with the goal of writing a report on the allegations. At this point, Ello still had not been apprised by his employer of the nature or details of the "allegations".

69. Proskauer Rose LLP (hereinafter "Proskauer") was a law firm comprised of lawyers duly licensed to practice law in the State of New York.

70. For about ten (10) years, Proskauer had performed legal services for Ello in his position on various trust funds.

71. At one point in 1994, Ello had questioned the size of Proskauer's bills, which were in excess of one million dollars ($1,000,000.00) per year, as unduly excessive for a trust fund with approximately one million dollars in assets.

72. Ello also complained to the other Fund Trustees about the size of these legal bills.

73. Plaintiff requested that Pocino arrange for him to receive in writing or e-mail the name of this outside attorney to confirm the attorney's credentials, impartiality and legitimacy. Pocino promised to do that, but it never happened despite plaintiff's repeated requests.

74. This inaction by Pocino further compromised the validity of the "investigation."

75. The stated time period of one (1) or two (2) days passed, during which time plaintiff received no letter or call, and Virga and the other trustees left to attend an approximate two (2) day conference in Florida, which all parties extended (in one case a trustee –Pocino-- extended by one (1) month).

76. That same evening, February 9, 2005, plaintiff arranged a special meeting with Robert Bonanza of the MTDC and an Inspector from the LIUNA Inspector General's Office, which commenced at approximately 9:15 p.m. on Long Island.

77. At the meeting plaintiff explained the little he knew of the charges.

and requested that the Inspector General's Office also look into this. He was advised Ishri Singh could not be interviewed by the Inspector General's Office because Singh was not a LIUNA member. Trustee approval would have to be given to allow Inspector General access to a Trust Fund employee.

78. Despite the Trustees having given the Inspector General access to non-union members in the past, upon information and belief, the Trustees did not make Ishri Singh available to the Inspector General, who could have come the next day, further isolating plaintiff from his work and constructively terminating him.

79. In or about March 2005, when Pocino returned from Florida, plaintiff questioned him as to why plaintiff had still not been contacted by an independent investigative attorney about Singh's allegations.

80. Pocino said he would never be contacted because Singh refused to be interviewed by him, and there was no point in proceeding with just one side of the story. Pocino also stated that he did not know what the next step could be, that plaintiff could return to the office, but must refrain from Trust Fund activities and any contact with Trust Fund employees, and could perform duties which Ello realized amounted to being his secretary.

81. Pocino further stated to Ello that he was very disappointed with the actions and inactions of Proskauer Rose, and would seek advice from other counsel and get back to plaintiff. He never did get back to plaintiff.

82. Some six weeks later, on March 28, 2005 around 5pm, plaintiff received a call at home from a man identifying himself as "Merrick Rossein", who claimed to be "investigating" the allegations of Singh.

83. Given the extremely late and untimely nature of this call, the fact that Pocino stated that plaintiff would not be called at all, and given that plaintiff was never notified in advance in any manner as to who Merrick Rossein (hereinafter "Rossein") was, Ello asked Rossein to call his attorney.

84. Upon information and belief, Proskauer Rose LLP had selected Rossein.

85. Upon information and belief, Rossein was not an "impartial" investigator because he had been selected by Proskauer Rose, paid for by Trust Fund Assets, and directed by Proskauer Rose; and as plaintiff was still accused of misconduct, Rossein could testify against

plaintiff if plaintiff spoke to him. Thus, plaintiff declined to meet with Rossein at that time.

86.  Pocino requested plaintiff's resignation letter on or about mid-March, and plaintiff complied under duress, as he had been constructively terminated from performing his duties.  Plaintiff included in the resignation letter that he still sought information as to the false allegations by Singh and explanation for the actions of his employers. Defendants failed to respond to Ello's requests. The letter unlawfully "terminated" Ello effective April 1, 2005.

87.  Upon information and belief, Kathleen McKenna, Esq. of Proskauer Rose called the police department handling the case and stated in pertinent part that "I want to get him and need first crack at him," meaning plaintiff, Richard Ello.  Upon information and belief, this was additional evidence that Rossein was merely an agent of Proskauer and not impartial or fair to plaintiff.

88.  This remark was upsetting to plaintiff, coming from a law firm he had trusted and relied upon for legal advice for many years.

89.  Upon information and belief, defendants perceived Ello as a Whistleblower, who they feared could or would report potentially unlawful or improper activity on the part of trustees, Trust Funds and /or Trust Funds employees.

90.  Upon information and belief, defendants concocted the Singh scheme to intimidate, malign, defame, shame and justify its termination of Ello and/or force him to leave.


### FIRST CAUSE OF ACTION AGAINST ISHRI SINGH:  Defamation, Filing A False Report, Perjury, Malicious Prosecution and Retaliation

91. Plaintiff repeats and realleges the statements in paragraphs numbered "1" through "90" as though herein after set forth.

92. Upon information and belief, plaintiff properly declined Singh's requests for employment in the Union dozens of times, in part, due to Singh's lack of experience.

93. Upon information and belief, Singh blamed plaintiff for, in his mind, blocking his career advancement and retaliated by both filing a false police report and committing perjury in a statement attached to the charges.

94. Upon information and belief, he was coached by, among other individuals, his "family in law enforcement" who, as he had told plaintiff "could get anyone arrested and charged".

95. As a result of Singh's unlawful actions, plaintiff both lost his job and positions.

96. Singh wrongfully obtained a restraining order against plaintiff, including any third party contact, effectively constraining plaintiff from launching a valid, independent investigation of the false charges.

97. Singh's actions constituted malicious prosecution of plaintiff.

98. Singh knew or should have known that his words and actions against were false and could harm plaintiff, but he communicated and acted as stated anyway.

99. Singh's actions constituted slander and libel against plaintiff.

100. Singh's own inactions show that his accusations and charges were false because, in part, upon information and belief, on the night of the alleged incident, Singh had to walk past the nighttime building security desk to exit the building. In doing so, he made no complaint, filed no report at that time, just said good night and left.

101. Upon information and belief, in addition, Singh, after leaving the building, could have walked to the police precinct across the street and filed a complaint but failed to do so.

102. Upon information and belief, Singh waited almost one (1) week to file a complaint, and that complaint was false.

103. As a result of the actions of Singh, plaintiff has been damaged in the sum of $60,000,000.00 and other damages to be determined at trial.

## SECOND CAUSE OF ACTION AGAINST
## RAYMOND POCINO: Breach of Fiduciary Duties /Obligations

104. Plaintiff repeats and realleges the statements in paragraphs numbered "1" through "103" as though herein after set forth.

105. Raymond M. Pocino ("POCINO") was, at all relevant times, a Trustee, Supervisor of the Mason Tender District Council, LIUNA Vice President and Eastern Regional Manager.

106. Upon information and belief, Pocino's position as a Union

Officer obligated him to, at the very least, promptly inform plaintiff Ello as a Union member, about the allegations of Singh against him.

107.    Instead, Pocino breached his obligation to Ello by failing and refusing to inform him of the allegations, claiming that Proskauer Rose had directed him not to speak to plaintiff about the allegations.

108.    Upon information and belief, Pocino acted against plaintiff in both his individual and official capacities.

109.    In addition, Pocino caused damage and prejudice to plaintiff in failing to promptly, much less ever, inform him of the allegations of Singh.

110.    To the detriment of plaintiff, Pocino provided no representation of plaintiff at all, thus further breaching his duties to plaintiff as a Trustee, a Supervisor, a Union Officer and a Fund participant.

111.    Pocino reneged on his promise to seek counsel outside of Proskauer Rose for purposes of investigating and informing Plaintiff of the allegations.

**112.**    As a result of the actions of Pocino, plaintiff has been damaged in the    sum of $60,000,000.00 and other damages to be determined at trial.

## THIRD CAUSE OF ACTION AGAINST
## RAYMOND POCINO:  WRONGFUL TERMINATION

113.    Plaintiff repeats and realleges the statements in paragraphs numbered "1" through "112" as though herein after set forth.

114.    By his orders and directives, Pocino constructively and actually terminated plaintiff's positions in which he had worked seventeen (17) years, specifically as LIUNA International Representative and LECET Director, both salaried positions, without justification to do so.

115.    By demanding that Ello write a letter of resignation and effectively forcing Ello to accept the job of a secretarial/clerical nature as opposed to his official duties, Pocino retaliated against and terminated Ello.

116.    By demanding that Ello write a letter of resignation and effectively forcing Ello to accept the job of a secretarial/clerical nature as opposed to his official duties, Pocino engaged in coercive conduct against Ello to terminate him.

**117.**    As a result of the actions of Pocino, plaintiff has been damaged in the sum of $60,000,000.00 and other damages to be determined at trial.

## FOURTH CAUSE OF ACTION AGAINST
## JOHN VIRGA: Whistleblower/Breach of Fiduciary Duties /Obligations and Retaliation

118.    Plaintiff repeats and realleges the statements in paragraphs numbered "1" through "117" as though herein after set forth.

119.    At all relevant times, Defendant John Virga ("Virga") was the Funds' Director.

120.    By lying to plaintiff and telling him that Singh was out with the flu and would return shortly, he hindered what could have been an immediate investigation on the part of plaintiff into the allegations of Singh.

121.    By hiding the dates, places and times of Trustees' meetings from Ello, he excluded Ello from the meetings and forced plaintiff to violate ERISA regulations and breach his fiduciary duty to participate in the meetings.

122.    By withholding the dates places and times of Trustees' meetings from plaintiff, Virga himself violated ERISA regulations and breached his fiduciary duty in part, by excluding plaintiff, in effect, picking and choosing which trustees he wanted to attend the meetings and by failing to follow the terms of the Plan.

123.    Upon information and belief, Virga also violated his fiduciary duties by his failure to enforce prudent policy to immediately investigate allegations by Fund employees.

124.    Upon information and belief, Virga was angry with plaintiff since weeks earlier, in late 2004, when plaintiff, in accordance with his fiduciary duties, discovered and reported both to Virga and to the Inspector General's Office people who were barred from Union membership due to their organized crime activities, but were, nevertheless illegally receiving free health insurance and life insurance from the MTDC Welfare Fund while he was Director. At the time plaintiff learned of this scandal he immediately rectified it, thus upsetting Virga, who was embarrassed and angry.

125.    Upon information and belief, Virga acted in both his individual and official capacities against plaintiff's interests to retaliate for plaintiff's actions relative to the scandal.

**126.**    As a result of the actions of Virga, plaintiff has been damaged in the sum of $60,000,000.00 and other damages to be determined at

trial.

## FIFTH CAUSE OF ACTION AGAINST
## JOHN VIRGA: CONSPIRACY

127.    Plaintiff repeats and realleges the statements in paragraphs numbered "1" through "126" as though herein after set forth.

128.    Upon information and belief, Virga conspired with defendants herein to wrongfully terminate Ello by hiding the trustees meetings from Ello, by forcing Ello to violate his ERISA duties, by failing and refusing to investigate the Singh "charges", and/or creating the Singh "charges" and/or by otherwise engaging in conduct in concert with others unknown to plaintiff, to wit: Jane and John Does "A through D".

129.    As a result of the actions of Virga, plaintiff has been damaged in the sum of $60,000,000.00 and other damages to be determined at trial.

## SIXTH CAUSE OF ACTION AGAINST
## LIUNA: WRONGFUL TERMINATION/LIBEL,SLANDER/CONSPIRACY

130.    Plaintiff repeats and realleges the statements in paragraphs numbered "1" through "129" as though herein after set forth.

131.    At all relevant times, LIUNA, established in 1903, was a labor organization affiliated with the AFL-CIO and charged with maintaining and assisting member local unions and district councils nationwide.

132.    LIUNA was plaintiff's primary employer.

133.    Upon information and belief, LIUNA, its agents, servants and employees, engaged in the retaliation, libel, slander and conspiracy leading to the termination of Ello by failing and refusing to reverse, stop, and or take action to prevent the actions taken against Ello by the above defendants, by failing to protect Ello and by other acts and omissions unknown at this time to plaintiff.

134.    As a result of the actions of LIUNA, plaintiff has been damaged in the sum of $60,000,000.00 and other damages to be determined at trial.

## SEVENTH CAUSE OF ACTION AGAINST LECET:  WRONGFUL
## TERMINATION/LIBEL,SLANDER/CONSPIRACY

135.    Plaintiff repeats and realleges the statements in paragraphs numbered "1" through "134" as though herein after set forth.

136.    At all relevant times, LECET established in 1996, was a fund chartered to bring together members of the Mason Tenders District Council of Greater New York and its signatory contractors to address issues of importance to both.

137.    Upon information and belief, LECET, its agents, servants and
employees, engaged in the above retaliation, libel, slander and
conspiracy leading to the termination of Ello by failing and refusing to
engage in, reverse, stop, and or take action to prevent the actions
taken against Ello by the above defendants, by failing to protect Ello
and by other acts and omissions unknown at this time to plaintiff.

138.    As a result of the actions of LECET, plaintiff has been
damaged in the sum of $60,000,000.00 and other damages to be
determined at trial.

## EIGHTH CAUSE OF ACTION AGAINST TRUST FUNDS

140. Plaintiff repeats and realleges the statements in paragraphs numbered
"1" through "139" as though herein after set forth.

141.  At all relevant times, Trust Funds were established trust funds under the
Taft-Hartley Labor Act of 1947 and governed by the local rules and
definitions of the Employee Retirement and Income Security Act (ERISA)
of 1974, which Funds included Pension, Welfare, Annuity, Training and
Staff Pension Plan.

142.  On or about February 4, 2005, a meeting was held attended by plaintiff
Ello, two attorneys from Proskauer Rose, and the other Fund's Trustees.
At this meeting, plaintiff reiterated that the private pension plan
maintained solely for the benefit of Trust Funds' employees, namely the
Mason Tenders District Council Staff Employees Pension Fund, was
excessively expensive and must be terminated.

143.  With no objection from the other Trustees, Plaintff directed Proskauer
Rose to investigate the proper termination process for this Plan.

144.  Plaintiff then suggested that the Trust Fund employees, as a substitute,
could receive the same pension benefits the Union members receive in
its place.

145.  Upon information and belief, while this action would have reduced
operating costs for the Trust Funds, defendants Virga and Singh would
be adversely affected on a personal basis.

146.  Singh's false allegations against Ello occurred on this same day, and upon information and belief, were made in retaliation against Ello for his suggestion in the meeting as to how to implement the plan.

147.  Upon information and belief, TRUST FUNDS, its agents, servants and employees, engaged in the retaliation, libel, slander and conspiracy with Singh leading to the termination of Ello by failing and refusing to reverse, stop, and or take action to prevent the actions taken against Ello by the above defendants, by failing to protect Ello and by other acts and omissions unknown at this time to plaintiff.

148.  Upon information and belief, the actions of defendants constituted a violation of Section 510 of ERISA, which reads in relevant part as follows:

> It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to this chapter . . ..

149. In addition, the actions of defendants are believed to have violated other federal statutes, which contain provisions which prevent employers from retaliating against employees who have raised any issue concerning the employer's compliance with the regulatory program set forth in the ERISA statute, as well as the analogous "whistleblower provisions" of FLSA and Title VII of the Civil Rights Act of 1964, making it unlawful

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding.

Section 704(a) of Title VII,  provides as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

150.  Upon information and belief, New Jersey Whistle-blowing statutes were violated by defendants in the manner described above.

151.  As a result of the actions of defendants, jointly and/or severally, Ello has been damaged in the sum of $60,000,000.00 and other damages to be determined at trial.

**WHEREFORE**, plaintiff requests that this Honorable Court advance this case on the docket, order a hearing at the earliest practical date, and upon such hearing:

1. Grant plaintiff a permanent injunction enjoining defendants, its agents, successors, employees and those acting in concert with defendants, from continuing to violate plaintiff's civil rights;

2. Issue an order requiring defendants to reinstate plaintiff at his proper job status; and

3. Grant plaintiff a judgment against defendants:

    a) In the sum of $50,000,000.00 on each cause of action, together with prejudgment interest thereon, from the dates the acts complained of commenced, together with post-judgment interest;

    b) In the sum of all out of pocket expenses and incidental financial losses incurred by plaintiff by reason of defendants' unlawful practices;

    c) For Punitive Damages of $10,000,000.00 or in such amount as will deter defendants from repeating their deceptive, discriminatory and injurious conduct;

    d) For Reinstatement to his prior status of employment;

    e) For Front Pay;

    f) For Back Pay.

    g) For Interest;

    h) For Fringe Benefits;

i)   Awarding plaintiff his reasonable attorney's fees and costs for

bringing this action;

j)   Awarding such other and further relief as to this Court is just and

proper.

Dated: January 25, 2005                    RUTH M. POLLACK, ATTORNEY
      Mineola, New York

BY: _____
RUTH M. POLLACK, ESQ. (RP 1407)
250 Old Country Road, Ste. 506
Mineola, New York 11501
Tel. (516) 746-0144
Fax. (516) 746-8008
ruthmpollackesq@verizon.net

Filename:            ellocomplaint3FIRSTAMENDEDCOMPLAINT
Directory:           \\Valued-9inv16ha\shared documents\CLIENTS\E\ELLO
Template:            C:\Documents and Settings\rpollack\Application
     Data\Microsoft\Templates\Normal.dot
Title:               CAPTION
Subject:
Author:              rpollack
Keywords:
Comments:
Creation Date:       1/25/2006 4:12 PM
Change Number:       7
Last Saved On:       1/25/2006 6:08 PM
Last Saved By:       rpollack
Total Editing Time:  115 Minutes
Last Printed On:     1/25/2006 6:08 PM
As of Last Complete Printing
     Number of Pages: 19
     Number of Words:        5,867 (approx.)
     Number of Characters:   30,513 (approx.)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
―――――――――――――――――――――――――――――――――――x

RICHARD ELLO,

                                    Plaintiff,

    -v-

                                                        Case No.
                                                        **JURY TRIAL**
                                                        **DEMANDED**

ISHRI SINGH, in his individual and official capacities;
RAYMOND POCINO, Vice President and Eastern Regional
Manager of LABORERS INTERNATIONAL UNION OF
NORTH AMERICA, in his individual and official capacities;
LABORERS INTERNATIONAL UNION OF NORTH
AMERICA; LABORERS-EMPLOYERS COOPERATION AND
EDUCATION TRUST FUND; RAYMOND POCINO, Trustee, in
his individual and official capacities; MASON TENDERS
DISTRICT COUNCIL TRUST FUNDS; JOHN VIRGA, Funds
Director, in his individual and official capacities; "John Doe and
Jane Doe A through D"; the latter being parties unknown to
plaintiff,

                                    Defendants.

―――――――――――――――――――――――――――――――――――x

Plaintiff, by its attorneys, POLLACK & KOTLER, as and for its verified complaint
alleges as follows:


                        BACKGROUND


1.  At all relevant times, plaintiff, Richard Ello, (hereinafter "Ello") resided
    at 477 Remsen Lane, Oyster Bay, New York.

2.  At all relevant times, Ello was employed by and successfully served
    numerous entities affiliated with the Laborers' International Union of
    North America (hereinafter referred to as "LIUNA") for seventeen (17)
    years.

3. Between 1988 and 1996 Ello was employed as the Controller of the Mason Tenders District Council of Greater New York (hereinafter referred to as "MTDC").

4. From 1996 until his constructive termination by defendants on April 1, 2005, Ello was employed as an "International Representative" for LIUNA in a salaried position.

5. During this period Ello also was elected by the membership as Secretary - Treasurer of LIUNA Local #108.

6. During this period Ello was appointed and served as "Deputy Supervisor" of Local 108 by the General President of LIUNA to cleanse the Local 108 of corruption.

7. In or about 1996 until his constructive termination on April 1, 2005 Ello was appointed by the Trustees of the Greater New York Laborers-Employers Cooperation & Education Trust Fund (hereinafter referred to as "LECET") to serve as its Director in a salaried position.

8. In or about 1995, Ello was also appointed Trustee of Demolition Workers Local #95 to cleanse it of corruption and to restore democratic practices.  The duties of this position included serving as a Trustee on the Local #95 Pension, Health and Annuity Funds.

9. In or about 1995 Ello was also selected to serve as a Committee Member of the MTDC Political Action Committee.

10. In or about 1998, Ello was selected to serve as an Administrative Committee member of the Laborers' Eastern Region Organizing Fund in Cranbury, NJ.

11. In early September 2004 Ello was chosen to serve as "Deputy Supervisor" of both the MTDC and LIUNA Local #79 to cleanse them of corruption and financial mismanagement.

12. In December 2004 Ello was selected to serve as a Trustee for the LIUNA Local #30 Trust Funds.

13. For many years until his constructive termination, Ello also served as a Trustee for the MTDC Pension, Welfare, Training, Annuity, Scholarship and Staff Pension Plan Trust Funds.

14. At all relevant times, Ello was a participant in the MTDC Pension, Annuity and Welfare Funds, entitling him to all benefits and protections afforded to all other participants equally.

15. The nature of these positions required Ello's extensive cooperation with the Federal Bureau of Investigation, the U.S. Department of Labor, the U.S. Department of Justice, the Manhattan District Attorney's Office, a court-appointed Monitor and a court-appointed Investigations Officer (the latter exclusively for the MTDC and the MTDC Trust Funds) and the Inspector General of LIUNA.

16. In his many senior level roles during his seventeen (17) years of managerial employment, Ello duly performed his duties in a lawful, professional and effective manner.

17. The MTDC generally offered better salary and benefits than did the MTDC Trust Funds.

18. On Friday, February 4, 2005 after regular working hours, plaintiff proceeded to a restaurant/bar across the street from the MTDC Offices, accompanied by LIUNA Local #79 employee George Gonzalez (hereinafter "Gonzalez") who said he wanted to speak to plaintiff in his role as "Deputy Supervisor" of Local #79 about an attempted robbery that day as well as other office issues.

19. From December 2004 until February 2005, Ishri Singh, (hereinafter "Singh") an employee of MTDC Trust Funds (hereinafter "Trust Funds") had made repeated verbal requests of Ello, in Ello's capacity as MTDC Deputy Supervisor and LECET Director, for MTDC or LECET employment.

20. On each occasion, plaintiff was compelled to deny Singh's requests for two reasons: 1. budgetary constraints, and 2. MTDC and LECET staffs are represented by a LIUNA Local #279 collective bargaining agreement which provided that any future job opening would first be offered to existing Local #279 members in good standing.

21. Singh was not a Local #279 member in good standing.

22. For between one (1) and two (2) years, Singh frequented plaintiff's office   at the MTDC on a nearly daily basis to obtain his signature on MTDC Trust Fund checks and other Fund-related documents.

23. During many of these visits Singh would "remind" plaintiff that he sought   placement at either the MTDC or the LECET.

24. Upon information and belief, these numerous requests were witnessed and/or overheard by Robert Bonanza, the senior elected Officer of the MTDC, whose office was located adjacent to that

of plaintiff Ello.

25.  On two (2) of Singh's most recent visits to Ello's office, Singh advised Ello that he had overheard MTDC employee Wendy Urena state that she desired to move to Eastern Long Island and seek employment in that area.  He also stated that he had heard Vice President and Eastern Regional Manager Raymond Pocino suggested that plaintiff consider hiring an assistant to ease plaintiff's workload.

26.  At a restaurant/bar to which plaintiff Ello and Gonzalez had gone to talk after work hours on February 4, 2005, Singh asked if he could join Ello and Gonzalez.  At that time he again asked Ello to inquire about two positions, and he requested that plaintiff nominate him for either the assistant position or the position, which might be vacated by Wendy Urena.

27.  At this place and time plaintiff tendered two responses to Singh's requests, neither of which were acceptable to Singh.  In regards to Wendy Urena's position, plaintiff had heard her speak about relocating for perhaps one (1) year but she had not done so.  Plaintiff speculated that her relocation might never happen and if it did, LIUNA Local #279 members would have preference by contract.  As far as filling the potential position as an assistant to plaintiff, Plaintiff Ello stated that he believed the MTDC could not afford an additional salary so it was unlikely that it would happen. In addition, the ideal candidate would have collective bargaining and organizing experience, both of which Singh denied having.

28.  Singh responded to Ello that he would be more useful to plaintiff than just a "regular employee", adding that his "family" was in "law enforcement", and he was aware of ways to have "anybody arrested and charged".

29.  Plaintiff replied that LIUNA maintains a very active Inspector General's Office, which plaintiff utilized constantly for any problems that surfaced and that he saw no need for outside law enforcement to be involved at the level at which he dealt.

30.  Singh then replied that conditions had gotten worse for him working at the MTDC Funds.  He stated that, in fact, he could not even show up for work on the previous day, February 3, 2005.  He also spoke of having had to file a harassment complaint against Mildred Dealy, a manager at the MTDC Trust Funds.

31.  Thereafter, Gonzalez left the bar/restaurant, saying that he had to deliver mail from plaintiff's office.

4

32. Over the course of the conversation about the possible positions discussed between Singh and plaintiff, Singh consumed four or five glasses of red wine, and began to appear somewhat intoxicated to plaintiff.  He walked outside the establishment two (2) times purportedly to accept cellular phone calls, explaining that he was arguing with his wife about being out while he had a sick child at home with chronic vomiting. He claimed to have lost the second call connection. He also said that if the vomiting did not cease, the child might be admitted to Jamaica Hospital in Queens the next day.

33. Plaintiff stated that he had to leave to make a meeting in Westbury, Long Island that evening.  Singh was, at this time, involved in a conversation with a female bartender, and at one point he was holding her hand/wrist.  Plaintiff, who was not involved in the conversation, overheard her say that she was a Colombia native, at which point Singh replied to her that he was also a South American native.

34. This statement of Singh surprised plaintiff because he recalled him once telling him that he was a Hindu from India.

35. At this time, approximately 7:30 p.m., plaintiff got up to leave, but stated that he would first have to return to his office across the street to retrieve some items and then go.  Singh asked if he could accompany him to use an office telephone and re-call his house, to which plaintiff agreed, out of concern for the child.

36. At the office, Singh dialed the telephone at MTDC employee Maria Rodriguez' desk.  While Singh was on the telephone, plaintiff went to his office to retrieve his items and then waited by the elevators ready to leave.  He offered to drive Singh home on his way out to Long Island, but Singh stated he might go back to the bar as the female bartender was getting off duty.

37. Plaintiff, leaving Singh behind, left for the evening and attended the meeting in Westbury.

38. The next business day, Monday, February 7, 2005, the MTDC Trust Fund computer (and e-mail capabilities) crashed for the first time in memory.

39. Upon information and belief, the video surveillance monitors were not working at the time of the allegations.

40. On or about the following Tuesday or Wednesday a Trust Fund employee advised Ello that Ishri Singh had either quit or was fired and

that he had witnessed Singh surrendering his building I.D. and being escorted out of the premises.

41.  As a MTDC Funds Trustee, plaintiff telephoned John Virga (hereinafter "Virga"), then "Funds' Director", to ascertain and/or confirm the reason for this personnel change as was plaintiff's responsibility.

42.  Virga came to plaintiff's office and stated that "Ishri" had only gone home with the flu; he would probably return the next day.  Plaintiff later learned  that this was false. He also asked John Virga if he was scheduling another Trustee meeting soon, because the one held last week had not gone well and many changes were being contemplated. Virga denied that a meeting was forthcoming, and plaintiff later learned that this statement was also false.

43.  Upon information and belief, a telephonic Trustees' meeting was held that afternoon without plaintiff's knowledge. Minutes of that meeting were never provided to plaintiff. Both of these factors raised possible serious ERISA violations and prevented plaintiff from carrying out his responsibilities.

44.  In the late afternoon of February 9, 2005, plaintiff received a call in his office from New York City Detective Whelan.  He advised plaintiff that Ishri Singh had just filed a complaint against him in which he made certain allegations of harassment, which Singh had purportedly alleged occurred during the prior week.

45.  The allegations made by Singh against Ello were patently false.

46.  Plaintiff appeared to answer the false charges, enter a not-guilty plea, and demand a trial by jury, and as a result, suffered damage to his reputation, anguish, humiliation, pain and suffering.

47.  Upon first learning of the false charges, plaintiff immediately called his superior, Vice President Raymond M. Pocino (hereinafter "Pocino") and requested a meeting.  Pocino advised Ello to meet him in the lobby bar of the Intercontinental Hotel at 6 p.m.

48.  Plaintiff arrived on time, and Pocino greeted him by saying that he just completed a MTDC Trust Funds Trustees' telephonic conference.  He further stated that he knew all about the harassment complaint, and was directed by the Proskauer Rose law firm not to speak to plaintiff about it.  He repeated this at least four (4) times.  He further elaborated that plaintiff was now denied access to "any Trust Fund", and was to "stay away" from any Trust Fund employee.

49. Plaintiff replied that this was akin to removing him from his job, without even explaining to Ello what had actually happened and why the action was being taken. Pocino did not respond.

50. Plaintiff further replied that this action violated his rights as a fund participant.  Pocino did not respond.

51. Pocino closed the conversation by stating that plaintiff would be contacted at home in one (1) or two (2) days by an "independent outside attorney, chosen by Proskauer Rose".  This person would interview first, Ishri Singh and then plaintiff, with the goal of writing a report on the allegations. At this point, Ello still had not been apprised by his employer of the nature or details of the "allegations".

52. Proskauer Rose LLP (hereinafter "Proskauer") was a law firm comprised of lawyers duly licensed to practice law in the State of New York.

53. For about ten (10) years, Proskauer had performed legal services for Ello in his position on various trust funds.

54. At one point in 1994, Ello had questioned the size of Proskauer's bills, which were in excess of one million dollars ($1,000,000.00) per year, as unduly excessive.

55. Ello also complained to the other Fund Trustees about the size of these legal bills.

56. Plaintiff requested that Pocino arrange for him to receive in writing or e-mail the name of this outside attorney to confirm the attorney's credentials, impartiality and legitimacy.  Pocino promised to do that, but it never happened despite plaintiff's repeated requests.

57. This inaction by Pocino further compromised the validity of the "investigation."

58. The stated time period of one (1) or two (2) days passed, during which time plaintiff received no letter or call, and Virga and the other trustees left to attend an approximate two (2) day conference in Florida, which all parties extended (in one case a trustee –Pocino-- extended by one (1) month).

59. That same evening, February 9, 2005, plaintiff arranged a special meeting with Robert Bonanza of the MTDC and an Inspector from the LIUNA Inspector General's Office, which commenced at approximately 9:15 p.m. on Long Island.

60.  At the meeting plaintiff explained the little he knew of the charges, and requested that the Inspector General's Office also look into this. He was advised Ishri Singh could not be interviewed by the Inspector General's Office because Singh was not a LIUNA member.  Trustee approval would have to be given to allow Inspector General access to a Trust Fund employee.

61.  Despite the Trustees having given the Inspector General access to non-union members in the past, upon information and belief, the Trustees did not make Ishri Singh available to the Inspector General, who could have come the next day, further isolating plaintiff from his work and constructively terminating him.

62.  In or about March 2005, when Pocino returned from Florida, plaintiff questioned him as to why plaintiff had still not been contacted by an independent investigative attorney about Singh's allegations.

63.  Pocino said he would never be contacted because Singh refused to be interviewed by him, and there was no point in proceeding with just one side of the story.  Pocino also stated that he did not know what the next step could be, that plaintiff could return to the office, but must refrain from Trust Fund activities and any contact with Trust Fund employees, and could perform duties which Ello realized amounted to being his secretary.

64.  Pocino further stated to Ello that he was very disappointed with the actions and inactions of Proskauer Rose, and would seek advice from other counsel and get back to plaintiff. He never did get back to plaintiff.

65.  Some six weeks later, on March 28, 2005 around 5pm, plaintiff received a call at home from a man identifying himself as "Merrick Rossein", who claimed to be "investigating" the allegations of Singh.

66.  Given the extremely late and untimely nature of this call, the fact that Pocino stated that plaintiff would not be called at all, and given that plaintiff was never notified in advance in any manner as to who Merrick Rossein (hereinafter "Rossein") was, Ello asked Rossein to call his attorney.

67.  Upon information and belief, Proskauer Rose LLP had selected Rossein.

68.  Upon information and belief, Rossein was not an "impartial" investigator because he had been selected by Proskauer Rose, paid

8

for by Trust Fund Assets, and directed by Proskauer Rose; and as plaintiff was still accused of misconduct, Rossein could testify against plaintiff if plaintiff spoke to him. Thus, plaintiff declined to meet with Rossein at that time.

69.  Pocino requested plaintiff's resignation letter on or about mid-March, and plaintiff complied under duress, as he had been constructively terminated from performing his duties.  Plaintiff included in the resignation letter that he still sought information as to the false allegations by Singh and explanation for the actions of his employers. Defendants failed to respond to Ello's requests. The letter unlawfully "terminated" Ello effective April 1, 2005.

70.  Upon information and belief, Kathleen McKenna, Esq. of Proskauer Rose called the police department handling the case and stated in pertinent part that "I want to get him and need first crack at him," meaning plaintiff, Richard Ello.  Upon information and belief, this was additional evidence that Rossein was merely an agent of Proskauer and not impartial or fair to plaintiff.

71.  This remark was upsetting to plaintiff, coming from a law firm he had trusted and relied upon for legal advice for many years.

72.  Upon information and belief, defendants perceived Ello as a Whistleblower, who they feared could or would report potentially unlawful or improper activity on the part of trustees, Trust Funds and /or Trust Funds employees.

73.  Upon information and belief, defendants concocted the Singh scheme to intimidate, malign, defame, shame and justify its termination of Ello and/or force him to leave.


### FIRST CAUSE OF ACTION AGAINST ISHRI SINGH:  Defamation, Filing A False Report, Perjury, Malicious Prosecution and Retaliation

74. Plaintiff repeats and realleges the statements in paragraphs numbered "1" through "73" as though herein after set forth.

75. Upon information and belief, plaintiff properly declined Singh's requests for employment in the Union dozens of times, in part, due to Singh's lack of experience.

76. Upon information and belief, Singh blamed plaintiff for, in his mind, blocking his career advancement and retaliated by both filing a false police report and committing perjury in a statement attached to the

charges.

77. Upon information and belief, he was coached by, among other individuals, his "family in law enforcement" who, as he had told plaintiff "could get anyone arrested and charged".

78. As a result of Singh's unlawful actions, plaintiff both lost his job and positions.

79. Singh wrongfully obtained a restraining order against plaintiff, including any third party contact, effectively constraining plaintiff from launching a valid, independent investigation of the false charges.

80. Singh's actions constituted malicious prosecution of plaintiff.

81. Singh knew or should have known that his words and actions against were false and could harm plaintiff, but he communicated and acted as stated anyway.

82. Singh's actions constituted slander and libel against plaintiff.

83. Singh's own inactions show that his accusations and charges were false because, in part, upon information and belief, on the night of the alleged incident, Singh had to walk past the nighttime building security desk to exit the building. In doing so, he made no complaint, filed no report at that time, just said good night and left.

84. Upon information and belief, in addition, Singh, after leaving the building, could have walked to the police precinct across the street and filed a complaint but failed to do so.

85. Upon information and belief, Singh waited almost one (1) week to file a complaint, and that complaint was false.

86. As a result of the actions of Singh, plaintiff has been damaged in the sum of $60,000,000.00 and other damages to be determined at trial.

## SECOND CAUSE OF ACTION AGAINST
## RAYMOND POCINO: Breach of Fiduciary Duties /Obligations

87. Plaintiff repeats and realleges the statements in paragraphs numbered "1" through "86" as though herein after set forth.

88. Raymond M. Pocino ("POCINO") was, at all relevant times, a Trustee, Supervisor of the Mason Tender District Council, LIUNA Vice President and Eastern Regional Manager.

89. Upon information and belief, Pocino's position as a Union Officer obligated him to, at the very least, promptly inform plaintiff Ello as a Union member, about the allegations of Singh against him.

90. Instead, Pocino breached his obligation to Ello by failing and refusing to inform him of the allegations, claiming that Proskauer Rose had directed him not to speak to plaintiff about the allegations.

91. Upon information and belief, Pocino acted against plaintiff in both his individual and official capacities.

92. In addition, Pocino caused damage and prejudice to plaintiff in failing to promptly, much less ever, inform him of the allegations of Singh.

93. To the detriment of plaintiff, Pocino provided no representation of plaintiff at all, thus further breaching his duties to plaintiff as a Trustee, a Supervisor, a Union Officer and a Fund participant.

94. Pocino reneged on his promise to seek counsel outside of Proskauer Rose for purposes of investigating and informing Plaintiff of the allegations.

95. As a result of the actions of Pocino, plaintiff has been damaged in the sum of $60,000,000.00 and other damages to be determined at trial.

## THIRD CAUSE OF ACTION AGAINST
## RAYMOND POCINO:  WRONGFUL TERMINATION

96. Plaintiff repeats and realleges the statements in paragraphs numbered "1" through "95" as though herein after set forth.

97. By his orders and directives, Pocino constructively and actually terminated plaintiff's positions in which he had worked seventeen (17) years, specifically as LIUNA International Representative and LECET Director, both salaried positions, without justification to do so.

98. By demanding that Ello write a letter of resignation and effectively forcing Ello to accept the job of a secretarial/clerical nature as opposed to his official duties, Pocino retaliated against and terminated Ello.

99. By demanding that Ello write a letter of resignation and effectively forcing Ello to accept the job of a secretarial/clerical nature as opposed to his official duties, Pocino engaged in coercive conduct against Ello to terminate him.

100. As a result of the actions of Pocino, plaintiff has been damaged in

the sum of $60,000,000.00 and other damages to be determined at trial.

### FOURTH CAUSE OF ACTION AGAINST
### JOHN VIRGA: Whistleblower/Breach of Fiduciary Duties /Obligations and Retaliation

101.Plaintiff repeats and realleges the statements in paragraphs numbered "1" through "100" as though herein after set forth.

102. At all relevant times, Defendant John Virga ("Virga") was the Funds' Director.

103. By lying to plaintiff and telling him that Singh was out with the flu and would return shortly, he hindered what could have been an immediate investigation on the part of plaintiff into the allegations of Singh.

104.By hiding the dates, places and times of Trustees' meetings from Ello, he excluded Ello from the meetings and forced plaintiff to violate ERISA regulations and breach his fiduciary duty to participate in the meetings.

105.By withholding the dates places and times of Trustees' meetings from plaintiff, Virga himself violated ERISA regulations and breached his fiduciary duty in part, by excluding plaintiff, in effect, picking and choosing which trustees he wanted to attend the meetings and by failing to follow the terms of the Plan.

  106.  Upon information and belief, Virga also violated his fiduciary duties by his failure to enforce prudent policy to immediately investigate allegations by Fund employees.

107.       Upon information and belief, Virga was angry with plaintiff since weeks earlier, in late 2004, when plaintiff, in accordance with his fiduciary duties, discovered and reported both to Virga and to the Inspector General's Office people who were barred from Union membership due to their organized crime activities, but were, nevertheless illegally receiving free health insurance and life insurance from the MTDC Welfare Fund while he was Director. At the time plaintiff learned of this scandal he immediately rectified it, thus upsetting Virga, who was embarrassed and angry.

108.       Upon information and belief, Virga acted in both his individual and official capacities against plaintiff's interests to retaliate for plaintiff's actions relative to the scandal.

109. As a result of the actions of Virga, plaintiff has been damaged in the sum of $60,000,000.00 and other damages to be determined at trial.

## FIFTH CAUSE OF ACTION AGAINST
## JOHN VIRGA: CONSPIRACY

110.Plaintiff repeats and realleges the statements in paragraphs numbered "1" through "109" as though herein after set forth.

111. Upon information and belief, Virga conspired with defendants herein to wrongfully terminate Ello by hiding the trustees meetings from Ello, by forcing Ello to violate his ERISA duties, by failing and refusing to investigate the Singh "charges", and/or creating the Singh "charges" and/or by otherwise engaging in conduct in concert with others unknown to plaintiff, to wit: Jane and John Does "A through D".
:

112. As a result of the actions of Virga, plaintiff has been damaged in the sum of $60,000,000.00 and other damages to be determined at trial.

## SIXTH CAUSE OF ACTION AGAINST
## LIUNA: WRONGFUL TERMINATION/LIBEL,SLANDER/CONSPIRACY

113.Plaintiff repeats and realleges the statements in paragraphs numbered "1" through "112" as though herein after set forth.

114. At all relevant times, LIUNA, established in 1903, was a labor organization affiliated with the AFL-CIO and charged with maintaining and assisting member local unions and district councils nationwide.

115. LIUNA was plaintiff's primary employer.

116. Upon information and belief, LIUNA, its agents, servants and employees, engaged in the retaliation, libel, slander and conspiracy leading to the termination of Ello by failing and refusing to reverse, stop, and or take action to prevent the actions taken against Ello by the above defendants, by failing to protect Ello and by other acts and omissions unknown at this time to plaintiff.

117. As a result of the actions of LIUNA, plaintiff has been damaged in the sum of $60,000,000.00 and other damages to be determined at trial.

## SEVENTH CAUSE OF ACTION AGAINST LECET:  WRONGFUL
## TERMINATION/LIBEL,SLANDER/CONSPIRACY

118. Plaintiff repeats and realleges the statements in paragraphs numbered "1" through "117" as though herein after set forth.

119.     At all relevant times, LECET established in 1996, was a fund chartered to bring together members of the Mason Tenders District Council of Greater New York and its signatory contractors to address issues of importance to both.

120.     Upon information and belief, LECET, its agents, servants and employees, engaged in the above retaliation, libel, slander and conspiracy leading to the termination of Ello by failing and refusing to engage in, reverse, stop, and or take action to prevent the actions taken against Ello by the above defendants, by failing to protect Ello and by other acts and omissions unknown at this time to plaintiff.

121.     As a result of the actions of LECET, plaintiff has been damaged in the sum of $60,000,000.00 and other damages to be determined at trial.

## EIGHTH CAUSE OF ACTION AGAINST TRUST FUNDS

122. Plaintiff repeats and realleges the statements in paragraphs numbered "1" through "121" as though herein after set forth.

123.     At all relevant times, Trust Funds were established trust funds under the Taft-Hartley Labor Act of 1947 and governed by the local rules and definitions of the Employee Retirement and Income Security Act (ERISA) of 1974, which Funds included Pension, Welfare, Annuity, Training and Staff Pension Plan.

124.     On or about February 4, 2005, a meeting was held attended by plaintiff Ello, two attorneys from Proskauer Rose, and the other Fund's Trustees.  At this meeting, plaintiff reiterated that the private pension plan maintained solely for the benefit of Trust Funds' employees, namely the Mason Tenders District Council Staff Employees Pension Fund, was excessively expensive and must be terminated.

125.     With no objection from the other Trustees, Plaintiff directed Proskauer Rose to investigate the proper termination process for this Plan.

126.     Plaintiff then suggested that the Trust Fund employees, as a substitute, could receive the same pension benefits the Union members receive in its place.

14

127.    Upon information and belief, while this action would have reduced operating costs for the Trust Funds, defendants Virga and Singh would be adversely affected on a personal basis.

128.    Singh's false allegations against Ello occurred on this same day, and upon information and belief, were made in retaliation against Ello for his suggestion in the meeting as to how to implement the plan.

129.    Upon information and belief, TRUST FUNDS, its agents, servants and employees, engaged in the retaliation, libel, slander and conspiracy with Singh leading to the termination of Ello by failing and refusing to reverse, stop, and or take action to prevent the actions taken against Ello by the above defendants, by failing to protect Ello and by other acts and omissions unknown at this time to plaintiff.

130.  Upon information and belief, the actions of defendants constituted a violation of Section 510 of ERISA, codified at 29 U.S.C. § **1140**, which reads in relevant part as follows:

> It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to this chapter . . ..

131. In addition, the actions of defendants are believed to have violated other federal statutes, which contain provisions which prevent employers from retaliating against employees who have raised any issue concerning the employer's compliance with the regulatory program set forth in the ERISA statute, as well as the analogous "whistleblower provisions" of FLSA and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17,  Section   15(a)(3) of FLSA, codified at 29 U.S.C. § 215(a)(3), which makes it unlawful

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding.

 Section 704(a) of Title VII, codified at 42 U.S.C. § 2000e-3(a), provides as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified,

assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

132. As a result of the actions of defendants, jointly and/or severally, Ello has been damaged in the sum of $60,000,000.00 and other damages to be determined at trial.

**WHEREFORE**, plaintiff requests that this Honorable Court advance this case on the docket, order a hearing at the earliest practical date, and upon such hearing:

1.  Grant plaintiff a permanent injunction enjoining defendants, its agents, successors, employees and those acting in concert with defendants, from continuing to violate plaintiff's civil rights;

2.  Issue an order requiring defendants to reinstate plaintiff at his proper job status; and

3.  Grant plaintiff a judgment against defendants:

    a)  In the sum of $50,000,000.00 on each cause of action, together with prejudgment interest thereon, from the dates the acts complained of commenced, together with post-judgment interest;

    b)  In the sum of all out of pocket expenses and incidental financial losses incurred by plaintiff by reason of defendants' unlawful practices;

    c)  For Punitive Damages of $10,000,000.00 or in such amount as will deter defendants from repeating their deceptive, discriminatory and injurious conduct;

    d)  For Reinstatement to his prior status of employment;

    e)  For Front Pay;

    f)  For Back Pay.

    g)  For Interest;

h)  For Fringe Benefits;

i)  Awarding plaintiff his reasonable attorney's fees and costs for

bringing this action;

j)  Awarding such other and further relief as to this Court is just and

proper.

Dated: November 8, 2005               POLLACK & KOTLER, ATTORNEYS
       Mineola, New York

BY: _____
RUTH M. POLLACK, ESQ. (RP 1407)
250 Old Country Road, Ste. 505
Mineola, New York 11501
Tel. (516) 746-0144
Fax. (516) 746-8008
ruthmpollackesq@verizon.net