UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RICHARD ELLO,

                              Plaintiff,

        -v-

ISHRI SINGH, in his individual and official
capacities; RAYMOND POCINO, Vice President
and Eastern Regional Manager of Laborers
International Union of North America, in his
individual and official capacities; LABORERS
INTERNATIONAL UNION OF NORTH
AMERICA; LABORERS-EMPLOYERS
COOPERATION AND EDUCATIONAL TRUST
FUND; RAYMOND POCINO, Trustee, in his
individual and official capacities; MASON
TENDERS DISTRICT COUNCIL TRUST FUNDS;
JOHN VIRGA, Funds Director, in his individual
capacities; JOHN and JANE DOES A through D,

                              Defendants.

Case No. 05-CV-9625 (KMK)

AMENDED* OPINION & ORDER

Appearances:

Ruth M. Pollack, Esq.
Mineola, New York
*Counsel for Plaintiff*

Kathleen M. McKenna, Esq.
Deidre A. Grossman, Esq.
Proskauer Rose LLP
New York, New York
*Counsel for Defendants Ishry Singh, Laborers-Employers Cooperation and Education Trust
Fund, Mason Tenders District Council Trust Funds, Raymond Pocino, as a Trustee of the Mason
Tenders District Council Trust Funds, and John Virga*

Samuel Rosenthal, Esq.
Curtis, Mallet-Prevost, Colt & Mosle, LLP
New York, New York
*Counsel for Defendants Laborers International Union of North America and Raymond Pocino*

Terrence G. Reed, Esq.
Lankford, Coffield & Reed, PLLC
Alexandria, Virginia
*Counsel for Defendants Laborers International Union of North America and Raymond Pocino*

KENNETH M. KARAS, District Judge:

Before the Court is Plaintiff's Motion to File a Proposed Second Amended Complaint

("PSAC") against Defendants Proskauer Rose LLP ("Proskauer"), Ishry Singh, Raymond

Pocino, John Virga, the Greater New York Laborers-Employers Cooperation and Education

Trust Fund ("GNYLECET"), Mason Tenders District Council Trust Funds ("MTDCTF"),

Laborers International Union of North America ("LIUNA"), Paul O'Brien, Charles Carron,

Merrick Rossein, and Chris Columbia (collectively "Defendants").[1]  Plaintiff alleges that several

Defendants have breached fiduciary duties to the MTDCTF[2]; that Plaintiff was discharged from

his employment in violation of the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. § 1001 *et seq.*; that several Defendants violated the Racketeer Influenced

and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*; and that some defamed

Plaintiff.  Defendants oppose Plaintiff's Motion on futility grounds, arguing that Plaintiff has

failed to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6).  For

the reasons stated below, Plaintiff's Motion is GRANTED in part and DENIED in part.

## I.  Background

A background of the facts leading up to this point in the litigation of this case is

---

[1]These Defendants are identified by Plaintiff in the caption of the PSAC.

[2]Hereinafter referred to as "Fund Defendants" or "the Fund."  Fund Defendants are
Singh; LECET; MTDCTF; Pocino, in his capacity as a Trustee of the MTDCTF; and Virga.

discussed in a prior Opinion & Order from this Court.  *See Ello v. Singh*, No. 05 Civ. 9625, 2006 WL 2270871 (S.D.N.Y. Aug. 7, 2006) (denying Plaintiff's motion to disqualify counsel). Rather than repeat those familiar facts here, the Court will refer to the relevant facts only when necessary.

There is a need, however, to lay out the procedural history of this case.  This case began on November 15, 2005 when Plaintiff filed a Complaint.  (Dkt. No. 1.)  Then, on February 9, 2006, Plaintiff filed an Amended Complaint.  (Dkt. No. 33.)  Five months later, on July 13, 2006 – the same day the Court scheduled oral argument on Plaintiff's motion to disqualify Defendants' counsel (Dkt. No. 36) – Plaintiff again attempted to amend his Complaint, this time without prior permission of the Court.[3]  The Court denied Plaintiff's disqualification motion, see *Ello*, 2006 WL 2270871, at *1, and denied Plaintiff's attempt to file the July 13th Complaint for failure to comply with the Court's Individual Practices (Dkt. No. 38).[4]  Less than a week later, Plaintiff sought the Court's permission to file an Amended Complaint.  (Dkt. No. 40.)  However, before the Court could schedule a conference to hear the Parties on what Complaint Plaintiff would seek leave to file, Plaintiff asked the Court to refrain from scheduling a conference, because he intended to file yet another Amended Complaint.  Before Plaintiff submitted his next Amended Complaint and accompanying motion, the Court explained that any additional amendments to the Complaint would have to be based on new evidence that was not previously

---

[3]This Amended Complaint was filed just after midnight of the day of oral argument on Plaintiff's motion to disqualify defense counsel.

[4]Pursuant to this Court's Order of October 10, 2006, the Amended Complaint that Plaintiff attempted to file on July 13, 2006 was stricken from the Court's Electronic Case Filing System.  (Dkt. No. 56.)

available to Plaintiff.  (Ct. Conf. Tr. 5-7, Sept. 12, 2006.)  After an exchange of letters between

the Parties, Plaintiff filed a Motion to Amend the Complaint with a PSAC on September 15,

2006.

      But there is more.  On November 6, 2006, this litigation took another step backward

before moving forward.  On that date, Plaintiff filed his Reply Memorandum of Law in Support

of its Motion to File the PSAC ("Plaintiff's Reply Memorandum").  Plaintiff's Reply

Memorandum, which unjustifiably exceeded the permitted page limit by thirty-nine pages,[5] was

also accompanied by what amounts to a Second Proposed Second Amended Complaint

("SPSAC").  Plaintiff's SPSAC, which he did not seek permission to file – the second time that

has happened in this case – seeks to expand Plaintiff's defamation claims and to add a malicious

prosecution claim against Singh and Proskauer.

      To summarize: After filing his Complaint in this case, Plaintiff amended his Complaint,

and after doing so, he filed a different, proposed Amended Complaint which was subsequently

rejected for failure to comply with the Court's Individual practices.  Plaintiff next withdrew a

different proposed Complaint (a third version of the Complaint, in effect), then submitted a

PSAC.  Finally, in the midst of briefing on the PSAC, without permission, Plaintiff attempted to

file a SPSAC.  Tallying the score, Plaintiff has filed five versions of the Complaint.  At the pre-

---

      [5]The Court's Individual Practices state that "[u]nless prior permission has been granted,
memoranda of law in support of and in opposition to motions are limited to 25 pages, and reply
memoranda are limited to 10 pages."  Hon. Kenneth M. Karas, Individual Practices, *available at*
http://www1.nysd.uscourts.gov/cases/show.php?db=judge_info&id=341.  The reply brief
submitted by Plaintiff contained fifty numbered pages, including a cover page and two different
pages numbered "7."  Plaintiff acknowledged that he failed to seek permission to file a forty-nine
page brief, but did so anyhow.  (*See* Pre-motion Conf. Tr. 7-8, Dec. 12, 2006.)

motion conference on the PSAC, after an inquiry by the Court as to what Complaint Plaintiff was

seeking leave to file, Plaintiff indicated that he is pursuing all of the causes of action in the

PSAC and the defamation claim raised in the SPSAC.[6]  (Pre-motion Conf. Tr. 26, Dec. 12,

2006.)  However, Plaintiff confirmed that he does not intend to go to trial on the malicious

prosecution claim raised in the SPSAC.  (*Id.*)

Plaintiff's allegations (which are assumed to be true for the purposes of this Motion) are

as follows:  (1) Defendants Proskauer, Virga, Pocino, O'Brien, and Carron breached fiduciary

duties owed to the Mason Tenders District Council Pension Plan and Welfare Plan (PSAC ¶¶ 24-

135); (2) Defendants Pocino, Proskauer, and Virga violated Section 510 of ERISA by

discharging Plaintiff from his positions with LIUNA and GNYLECET (*id.* ¶¶ 136-96); (3)

Defendants Proskauer, Virga, Pocino, O'Brien, and Carron, operated MTDCTF in violation of

RICO (*id.* ¶¶ 197-286); and (4) Defendants Proskauer, Pocino, Rossein, Singh, and Columbia

defamed Plaintiff (SPSAC ¶¶ 287-418).

This case initially arose out of an allegation by Singh, an accounts payable employee of

the MTDCTF, that Plaintiff sexually assaulted Singh on February 4, 2005.  At the time, Plaintiff

was an employee of the LIUNA and the MTDC, where he held numerous positions within both

organizations.  *See Ello*, 2006 WL 2270871, at *1 (describing Plaintiff's prior positions).

Plaintiff claims that Singh, an employee of MTDCTF,[7] approached Plaintiff on a number of

---

[6]Plaintiff stated at the December 12, 2006 conference that the expanded defamation
claims in the SPSAC were prompted by the discovery of Merrick Rossein's report, which
Plaintiff's counsel described as "new evidence" that "was shared with us . . . recently."  (Pre-
motion Conf. Tr. 25-26, Dec. 12, 2006.)

[7]MTDC is responsible for appointing trustees to the MTDCTF.  (PSAC ¶ 5.)  MTDC is a
LIUNA-affiliated district counsel which engages in collective bargaining with employers on

occasions between December 2004 and February 2005 to solicit Plaintiff's assistance in securing

a position with the MTDC.  Plaintiff allegedly rebuffed Singh's requests, due to what Plaintiff

says were budgetary constraints and policies which favor LECET and Local #279 employees for

available positions.  Despite Plaintiff's refusal to offer Singh employment, Singh allegedly

continued to remind Plaintiff that he was interested in employment.  On February 4, 2005,

Plaintiff and Singh had a conversation at a local restaurant and bar.  During this conversation,

Singh allegedly attempted to make his prospective employment more attractive by claiming that

he had family in law enforcement.  Plaintiff allegedly told Singh that LIUNA maintained an

active Inspector General's Office and that there was no need for the assistance of outside law

enforcement.  Plaintiff claims that this was the end of their interactions that night – once the

conversation ended, the two men headed towards the offices of the MTDCTF and eventually

parted ways.

Plaintiff claims that Singh retaliated against Plaintiff for his refusal to hire him by filing

false allegations that Plaintiff sexually assaulted Singh on February 4, 2005.  Plaintiff alleges

that he learned of Singh's allegation on February 9, 2005, from New York City Detective

Whelan.  (PSAC ¶ 167.)  That same day, Plaintiff believes that a meeting of Trustees was held to

discuss Singh's allegations against Plaintiff.  (*Id.* ¶ 166.)  This alleged meeting was held in

Plaintiff's absence and the minutes were subsequently withheld from Plaintiff.  (*Id.*)  That same

day, Pocino told Plaintiff to stay away from the MTDCTF's employees and staff, allegedly

pursuant to Proskauer's advice.  (*Id.* ¶ 172.)  Pocino refused to discuss Singh's harassment report

---

behalf of union members.  (*Id.*)  "LIUNA is a national labor organization overseeing the
operations of local unions and district councils.  In that role, LIUNA acts as the parent
organization of MTDC."  *Ello*, 2006 WL 2270871, at *1 n.2.

with Plaintiff, also allegedly pursuant to Proskauer's advice.  (*Id.*)  Singh's allegation caused the

MTDCTF to subsequently investigate the claim.  Proskauer, serving as counsel, retained Merrick

T. Rossein, Esq., to conduct an investigation.  Plaintiff, apparently on the advice of his counsel,

never met with Rossein.  In mid-March 2005, Pocino requested Plaintiff's resignation, which

Plaintiff submitted under "duress."  (*Id.* ¶¶ 188-89.)

## II.  Discussion

### A.  Standard of Review

Rule 15(a) of the Federal Rules of Civil Procedure states that leave to amend a complaint

should be "freely given when justice so requires."  Fed. R. Civ. P. 15(a).  However, "[a] district

court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or

undue prejudice to the opposing party."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184,

200 (2d Cir. 2007).  "When the plaintiff has submitted a proposed amended complaint, the

district judge may review that pleading for adequacy and need not allow its filing if it does not

state a claim upon which relief can be granted."  *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119,

123 (2d Cir. 1991).  The adequacy of the proposed amended complaint is judged by the same

standard as that applied to a motion to dismiss for failure to state a claim, Rule 12(b)(6) of the

Federal Rules of Civil Procedure.  *See General Elec. Capital Financial, Inc. v. Bank Leumi Trust

Co. of New York*, No. 95 Civ. 9224, 1999 WL 33029, at *5 (S.D.N.Y. Jan. 21, 1999) (citing

*Ricciuti*, 941 F.2d at 123).

A motion brought under Fed. R. Civ. P. 12(b)(6) posits that Plaintiff has failed "to state a

claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  The Supreme Court has

recently held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not

7

need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle-[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted and second alteration in original). In *Bell Atlantic*, *id.* at 1964-69, the Supreme Court also abandoned reliance on the oft-quoted refrain from *Conley v. Gibson* that, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief[,]" 355 U.S. 41, 45-46 (1957). As the Court explained, a literal application of *Conley*'s "no set of facts" rationale is improper because "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery . . . ." *Bell Atl.*, 127 S. Ct. at 1968. Instead, the Court emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . [,]" *id.* at 1965, and "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint[,]" *id.* at 1969. Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974; *see also Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) ("After careful consideration of the Court's opinion and the conflicting signals from it that we have identified, we believe the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*."). If Plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Bell Atl.,* 127 S. Ct. at 1974.

8

When considering a Rule 12(b)(6) motion, a court must limit itself to facts stated in the complaint, documents attached to the complaint, and documents incorporated into the complaint. *See Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir. 1996) (citation omitted).  The Court will accept as true Plaintiff's allegations, and draw all inferences in Plaintiff's favor. *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993); *Blimpie Int'l, Inc. v. Blimpie of the Keys*, 371 F. Supp. 2d 469, 470-71 (S.D.N.Y. 2005).  At this stage, the Court is not concerned with weighing the evidence which would be presented at trial. *See Chosun Int'l Inc. v. Chrisha Creations, Ltd.*, 413 F.3d 324, 327 (2d Cir. 2005).

B.  ERISA

Congress has stated that the primary purpose of ERISA is to "protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information . . . ."  29 U.S.C. § 1001(b).  ERISA achieves these objectives "by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." *Id.*  In addition, ERISA was intended to "to protect interstate commerce, the Federal taxing power, and the interests of participants in private pension plans and their beneficiaries by improving the equitable character and the soundness of such plans by requiring them to vest the accrued benefits of employees with significant periods of service, to meet minimum standards of funding, and by requiring plan termination insurance."  29 U.S.C. § 1001(c).

Plaintiff has pled two ERISA causes of action.  First, he alleges that certain Defendants breached their fiduciary duties under ERISA.  Second, he alleges that his employment was terminated in violation of ERISA.  Both claims are discussed, in turn.

### 1.  Breach of Fiduciary Duty under Section 502 of ERISA

Section 502 of ERISA, 29 U.S.C. § 1132, provides a number of causes of action to enforce ERISA's regulation of employee benefit plans.  The rights enforced by Section 502 are found in each employee benefit plan, in the statutes that make-up ERISA, and in the common-law of ERISA as developed by the courts.  Plaintiff's first ERISA claim is for breach of fiduciary duties.  Plaintiff brings this action as a former Trustee of the MTDCTF and as a participant in the Pension and Welfare Plans.[8]  (PSAC ¶ 24.)  Plaintiff claims that Proskauer, Virga, Pocino, O'Brien, and Carron[9] breached their fiduciary duties owed towards the MTDC Pension, Annuity, and Welfare Plans.  (*Id.*)  Section 404 of ERISA describes four affirmative duties for fiduciaries: (1) exclusive purpose; (2) prudence; (3) diversification; and (4) acting in accordance with the plan.  *See* 29 U.S.C. § 1104.  Plaintiff seeks injunctive and equitable relief pursuant to 29 U.S.C. § 1132(a).  ( PSAC ¶ 24.)

Plaintiff alleges that Proskauer, serving as counsel to MTDC and MTDCTF, acted as a fiduciary as that term is defined in 29 U.S.C. § 1002(21).  Plaintiff merely alleges, on information and belief, that Proskauer was retained as a "Fund fiduciary."  (PSAC ¶ 31.)  He alleges that Proskauer is a fiduciary of the pension, annuity, and welfare plans because it went

---

[8]Plaintiff does not claim that he was a participant in the Training Fund, so he cannot bring an ERISA action against the Training Fund.  (*See* PSAC ¶¶ 72-75.)

[9] LIUNA is never specifically named as a Defendant in this count.

beyond merely providing legal advice. (*Id.*)  Proskauer also allegedly usurped the Trustees'

powers by dictating certain courses of action, rather than merely advising the Trustees. (*Id.* ¶

33.)  According to Plaintiff, Proskauer undertook discretionary control and authority in the

administration of the MTDC. (*Id.* ¶¶ 34-75.)  The allegations include:  Proskauer selected Virga

for the position of Director based on a pre-existing relationship, despite Virga's lack of adequate

credentials (*id.* ¶ 35); Proskauer attorneys attended Trust Fund and Executive Board meetings,

even though their attendance was not mandatory (*id.* ¶ 36); Proskauer's presence deterred

opposition to Proskauer's views on various matters (*id.* ¶ 38); Proskauer wrote the minutes for

several, high-level meetings, and billed the MTDC for time devoted to this effort – work which

Plaintiff claims was unnecessary and costly (*id.* ¶¶ 40-49); Proskauer attorneys traveled to

MTDCTF meetings at the expense of the MTDC (*id.* ¶¶ 51-53); Proskauer took over MTDC's

delinquency work (*id.* ¶¶ 54-59); Proskauer favored litigation over settlement in a particular case

(*id.* ¶¶ 60-67); Proskauer advised against taking any legal action against Carlos Mellace, who at

one time was a co-administrator of MTDCTF (*id.* ¶¶ 68-71); and Proskauer submitted a bill for

$49,192.50 for services related to a real estate purchase under the Training Fund, which Plaintiff

claims was not authorized (*id.* ¶¶ 72-75).

　　　With respect to the other Defendants named in this cause of action, Plaintiff alleges a

number of other breaches of fiduciary duties, including: the authorization of a vehicle for Virga's

use (*id.* ¶¶ 81-84); Virga's decision to provide breakfast for himself and other employees (*id.* ¶

85); the payment of welfare benefits to at least one expelled member of the union – a matter

which Plaintiff investigated and Proskauer attempted to conceal (*id.* ¶¶ 90-98); Virga's failure to

report account delinquencies (*id.* ¶¶ 100-11); O'Brien's recommendation to hire Lazard Asset

Management ("Lazard") to manage plan assets without disclosing that O'Brien's son, a recent college graduate, had been hired by Lazard (*id.* ¶¶ 112-15); the conflict of interest due to Proskauer's representation of Lazard (*id.*); the all-expense-paid golfing trips to exclusive golf resorts enjoyed by Pocino and his wife (*id.* ¶¶ 116-18); Proskauer's revision of an investment management agreement to establish higher fees (*id.* ¶¶ 119-21, 126-27); Proskauer's use of plan assets to prove Plaintiff was criminally liable for assaulting Singh (*id.* ¶¶ 122-24); Proskauer's, Virga's, O'Brien's, and Carron's conspiracy to preclude Plaintiff from attending Trust Fund and Executive Board meetings (*id.* ¶ 125); Proskauer's, Virga's, O'Brien's, and Carron's conspiracy to deny Plaintiff access to records (*id.*); and Proskauer's erroneous advice to MTDCTF regarding the Pension Plan's Summary Plan Description (*id.* ¶¶ 130-35).

The Court begins its analysis of these claims with an examination of the standing requirement under Section 502 of ERISA. Section 502 names three classes of persons who may commence an action for breach of a fiduciary duty: (1) a participant or beneficiary, (2) the Secretary of Labor, and (3) a fiduciary. 29 U.S.C. § 1132(a); *see McCabe v. Trombley*, 867 F. Supp. 120, 125 n.3 (N.D.N.Y. 1994) ("Section 1132 is the provision which defines the scope of the court's subject matter jurisdiction over the instant suit, in which plaintiff alleges a breach of fiduciary duty."). Plaintiff brings this cause of action as a former Trustee of the MTDCTF, as well as a plan participant.

As a former Trustee, Plaintiff lacks standing to allege a breach of fiduciary duties. In *Chemung Canal Trust Co. v. Sovran Bank/Md.*, 939 F.2d 12 (2d Cir. 1991), the Second Circuit long ago held that a former fiduciary lacks standing to claim a breach of ERISA's fiduciary duties, *id.* at 14. The Second Circuit considered the list of people that Section 502 allows to sue,

and concluded that "[t]he statute names only three classes of persons who may commence an action, and a former fiduciary is not one of them."  *Id.*  The Second Circuit went on to explain that the list in Section 502 was "exclusive" and that the statute's legislative history indicated no intent to "grant a former fiduciary a continuing right to sue on behalf of the plan . . . ."  *Id.*  Accordingly, Plaintiff lacks standing to sue as a former Trustee.[10]

Plaintiff also claims standing as a plan participant.  Standing requirements for a plan participant differ depending on kind of relief requested by Plaintiff.[11]  While "a plan participant may have Article III standing to obtain injunctive relief related to ERISA's disclosure and fiduciary duty requirements without a showing of individual harm to the participant[,]" Plaintiff must have "suffered an injury-in-fact" to claim restitution or disgorgement.  *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 199-200 (2d Cir. 2005); *see also New York Dist. Council of Carpenters Pension Fund v. Savasta*, No. 99 Civ. 11362, 2005 WL 22872, at *2 (S.D.N.Y. Jan. 4, 2005) (noting that Section 502(a)(3) provides for limited relief, and not "classic compensatory and punitive damages.").

The PSAC contains two instances where the Plaintiff alleges that he was personally affected by the alleged breaches of fiduciary duty.  First, Plaintiff claims that Proskauer expended plan assets starting in February 2005 to prove Plaintiff was guilty of criminal charges (PSAC ¶ 122); and second, that Proskauer, Virga, O'Brien, and Carron conspired to deny

_____

[10]The Court is perplexed that counsel for Plaintiff did not research this point before filing the various proposed amended complaints, or retreat from this position in her reply brief after being presented with this on-point authority.

[11] Plaintiff requests various kinds of relief, including, but not limited to, restitution and disgorgement.  (PSAC ¶ 135(III)).

Plaintiff access to Fund records and to preclude him from attending Trust Fund and Executive Board meetings (*id.* ¶ 125). The Court will assume that Plaintiff has adequate participant standing for these two allegations because of these specific claims in the PSAC that Plaintiff was personally injured.

Standing, however, does not end the matter: Fund Defendants argue that even if Plaintiff has standing, he has not pled a breach of any duty, because no interest of his in the Fund has been denied or taken away. The Court agrees. An employer's investigation of allegation of sexual harassment "is not a gratuitous or optional undertaking; under federal law, an employer's failure to investigate may allow a jury to impose liability on the employer." *See Malik v. Carrier Corp.*, 202 F.3d 97, 105 (2d Cir. 2000). Thus, Fund Defendants had "an affirmative duty to investigate the report of an allegation of sexual harassment." *Id.* at 109. Furthermore, Proskauer cannot be sued for a breach of fiduciary duties in investigating Singh's allegations because, *inter alia*, its services were authorized by the Trustees, and do not "amount to illegal profits or ill-gotten gains derived directly from defendants' alleged culpable acts." *See Savasta*, 2005 WL 22872, at *2-3 (holding that fees paid to a non-fiduciary pursuant to a service agreement with a union fund are not actionable as disgorgement under Section 502 of ERISA). Although Section 510 of ERISA may permit a cause of action against a fund attorney, *see Greenwood Mills, Inc. v. Burris*, 130 F. Supp. 2d 949, 960-61 (M.D.Tenn. 2001), Plaintiff must allege far more egregious conduct than what he alleges here, which is nothing more than his disagreement with Proskauer's role and some of their fees.

Plaintiff's second allegation of breach is also unfounded. Fund Defendants' decision to preclude Plaintiff from attending a meeting of the Trustees and accessing Fund records, even if

14

true, does not state a breach of fiduciary duty recognized by statute, any plan, or the common-law. Plaintiff's allegations do not state a claim, in large part, because they are far afield from ERISA's purpose, as well as the statutory rights and rights at common-law that ERISA seeks to protect. *See* 29 U.S.C. §§1001(b)-(c), 1104, 1132(a); *see also Massachusetts v. Morash*, 490 U.S. 107, 112 (1989) ("ERISA was passed by Congress in 1974 to safeguard employees from the abuse and mismanagement of funds that had been accumulated to finance various types of employee benefits."); *Ancekewicz v. Long Island Univ.*, No. 02 Civ. 4490, 2005 WL 1411917, at *8 (E.D.N.Y. June 15, 2005) ("ERISA's goal of protecting [pension and other] benefits from interference does not transform ERISA's statutory scheme into a federal job protection scheme." (quoting *Raymond v. Mobil Oil Corp.*, 983 F.2d 1528, 1539 (10th Cir. 1993)) (alteration in original). Nothing about precluding Plaintiff from meetings about his alleged sexual assault, even if that assault never occurred, remotely threatens the management of Plaintiff's benefits.

Proskauer also argues that Plaintiff has not sufficiently pled that Proskauer is a fiduciary under 29 U.S.C. § 1002(21). The statute states, in relevant part:

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C.A. § 1002(21)(A). "This definition requires (1) showing that the plan assets are at issue and (2) that the individual defendants exercised authority or control relating to the management or disposition of such assets." *Maney v. Fischer*, No. 96 Civ. 0561, 1998 WL

151023, at *4 (S.D.N.Y. Mar. 31, 1998). Courts have construed broadly the definition of

"fiduciary" contained in ERISA. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993).

"[W]hether or not an individual or entity is an ERISA fiduciary must be determined by focusing

on the function performed, rather than on the title held." *Blatt v. Marshall & Lassman*, 812 F.2d

810, 812 (2d Cir. 1987) (holding that defendants were fiduciaries because they exercised actual

control over plan assets). Relying on the Department of Labor's regulations promulgated under

ERISA, the Second Circuit has explained that:

> [A]n attorney, accountant, actuary or consultant who renders legal,
> accounting, actuarial or consulting services to an employee benefit
> plan . . . [is not] a fiduciary to the plan solely by virtue of the
> rendering of such services, absent a showing that such consultant
> (a) exercises discretionary authority or discretionary control
> respecting the management of the plan, (b) exercises authority or
> control respecting management or disposition of the plan's assets,
> (c) renders investment advice for a fee, direct or indirect, with
> respect to the assets of the plan, or has any authority or
> responsibility to do so, or (d) has any discretionary authority or
> discretionary responsibility in the administration of the plan.

*F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259-60 (2d Cir. 1987) (quoting

29 C.F.R. § 2509.75-5 (1986)).

Plaintiff's conclusory allegations merely portray Proskauer as a zealous advocate for the

Fund, and Plaintiff's personal opposition to Proskauer's role or billing practices fails to make

Proskauer a fiduciary. The allegations in the PSAC fall far short of claiming that Proskauer had

discretionary authority or control over the Fund; that Proskauer managed Fund assets; rendered

investment advice; or had discretionary authority or responsibility over the administration of the

Fund. While Plaintiff also makes many conclusory allegations about Proskauer's hands-on

involvement with the Fund, nothing in the PSAC is sufficient to allege that Proskauer crossed the

16

threshold from legal counsel to that of a fund fiduciary.  *See Acosta v. Pace Local I-300 Health Fund*, No. 04 Civ. 3885, 2007 WL 496877, at *8-9 (D. N.J. Feb. 9, 2007) (holding that conclusory claims that lawyer acted as fiduciary for ERISA purposes did not state a claim upon which relief could be granted).  Instead, Plaintiff's allegations merely demonstrate that Proskauer's services were typical of those provided by legal counsel, rather than those of a fiduciary.  *See, e.g.*, *Health Cost Controls of Illinois, Inc. v. Washington*, 187 F.3d 703, 709 (7th Cir. 1999) ("[L]awyers and other professionals who render services to the plan's administrator do not exercise any decisionmaking authority over the plan or plan assets; the power to act for the plan is essential to status as a fiduciary under ERISA.") (internal quotations omitted); *see Custer v. Sweeney*, 89 F.3d 1156, 1163 (4th Cir. 1996) (affirming dismissal of claim that lawyer was fiduciary because allegations in complaint were insufficient to allege status as fiduciary) (citing 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 at 317-18 (2d ed. 1990) (noting that court need not accept plaintiff's "'unwarranted deductions,' 'footless conclusions of law,' or 'sweeping legal conclusions cast in the form of factual allegations'" (footnotes omitted)); *Bd. of Trs. of Teamsters Local 918 Pension Fund v. Freeburg & Freeburg, C.P.A.*, No. 98 Civ. 4895, 1999 WL 803895, at *2 n.1 (E.D.N.Y. Sept. 28, 1999) ("Professionals, such as attorneys or accountants, are not fiduciaries unless they provide more than ordinary professional services to a plan."); *Carpenters' Local Union No. 964 Pension Fund v. Silverman*, No. 93 Civ. 8787, 1995 WL 378539, at *2 (S.D.N.Y. June 26, 1995) ("The mere provision of usual or ordinary professional services, such as by attorneys, does not imply

fiduciary status.").[12] Accordingly, Proskauer cannot be sued as an ERISA fiduciary and Plaintiff's claim in this regard fails.

Fund Defendants also contend that several of Plaintiff's allegations are barred by ERISA's statute of limitations. ERISA requires that an action for breach of fiduciary duty be brought:

> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation; except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113. Fund Defendants argue that Plaintiff's position as a Trustee gave Plaintiff actual knowledge of many of the alleged breaches of fiduciary duty brought in this case. Plaintiff became a Trustee of the MTDC in August 1996, *see Ello*, 2006 WL 2270871, at *2, and remained a Trustee until his resignation on April 1, 2005, which Plaintiff characterizes as a constructive discharge. (PSAC ¶¶ 188-89.) It is not clear, however, whether the three-year limitation or the six-year limitation applies in this case, or if some combination of the three- and six-year limitations apply to different claims.

The three-year limitation applies "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation . . . ." 29 U.S.C. § 1113(2). "[A] plaintiff has 'actual knowledge of the breach or violation' within the meaning of ERISA § 413(2), 29 U.S.C.

---

[12] For an example of a case where an attorney became a fiduciary, *see Mason Tenders Dist. Council Pension Fund v. Messera*, 958 F. Supp. 869, 882 (S.D.N.Y. 1997) (holding that lawyer who was member of fund's investment committee who made investment decisions was a fiduciary).

§ 1113(2), when he has knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act." *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2d Cir. 2001). By contrast, "the six-year statute of limitations should be applied to cases in which a fiduciary: (1) breached its duty by making a knowing misrepresentation or omission of a material fact to induce an employee/beneficiary to act to his detriment; *or* (2) engaged in acts to hinder the discovery of a breach of fiduciary duty." *Id.* at 190.

At this stage of the case, Defendants have opposed Plaintiff's Motion to File a Proposed Second Amended Complaint on futility grounds. Defendants argue that the PSAC fails to state a claim upon which relief can be granted. Much of what Fund Defendants ask the Court to decide on the statue of limitations defense cannot be decided on a Rule 12(b)(6) motion because the Court must limit its review to the PSAC, documents attached to the PSAC, and documents incorporated into the PSAC by reference. *See Newman*, 102 F.3d at 662. "Dismissal for failure to state a claim based on a statute of limitations is appropriate only if a complaint shows clearly that a claim is not timely." *Toussaint v. JJ Weiser & Co.*, No. 04 Civ. 2592, 2005 WL 356834, at *11 (S.D.N.Y. Feb. 13, 2005); *see also Harris v. City of New York*, 186 F.3d 243, 251 (2d Cir. 1999). The PSAC, in all but a single instance, which is discussed below, fails to identify when the alleged breaches took place. Fund Defendants' counsel asks the Court to consider the affidavit of John J. Virga, which offers dates for the alleged breaches, to fill the void left by the PSAC. Virga's affidavit, however, does not fit within the three categories of materials that this Court can consider when Defendants merely contest the sufficiency of the pleadings, as they

19

have done here.  Therefore, the Court will not consider Virga's affidavit to decide the statute of limitations defense.[13]

One of Plaintiff's claims is susceptible to adjudication on the pleadings.  Plaintiff claims that the Trustees' decision to retain Carlos Mellace, who retired in December 1998, was a breach of fiduciary duty.  (PSAC ¶¶ 68-71.)  Under the more lenient, six-year statute of limitations, Plaintiff's last opportunity to bring a claim for this alleged breach was December 2004.[14] Plaintiff's first Complaint in this case was filed on November 15, 2005, which is beyond the six-year limitation period.  This claim is barred under the statute of limitations and therefore is futile.[15]

_____

[13]Fund Defendants are correct to note, however, that the existence of these documents may be relevant to the good faith and due diligence of Plaintiff and his counsel in making the allegations in the PSAC.

[14]Because Plaintiff himself was a Trustee starting in 1996, he also had actual knowledge of this alleged breach well before the three-year statute of limitations ran.

[15]Counsel for LIUNA and Pocino urge the Court to hold that Plaintiff violated Fed. R. Civ. P. 23.1 by failing to make a demand on the MTDCTF to bring suit, citing *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 287 (2d Cir. 1992).  This argument is rejected, because *Diduck*'s holding was limited to claims brought under Section 502(g)(2), 29 U.S.C. § 1132(g)(2), which can only be brought by fiduciaries.  *See Coan v. Kaufman*, 457 F.3d 250, 258 (2d Cir. 2006) (explaining that a fiduciary's right of action under Section 502(g)(2) must comply with Fed. R. Civ. P. 23.1, but that a claim brought as a plan participant under Section 502(a)(2) is not controlled by *Diduck*).  Plaintiff, as a participant, need not comply with Rule 23.1, because he may not proceed under Section 502(g)(2), and *Diduck* is only controlling as to the latter. Fund Defendants argue that Plaintiff's claims are barred by the doctrines of unclean hands, *in pari delicto*, and acquiescence, because Plaintiff served as a Trustee when many of the events in the PSAC took place.  The Court cannot decide this issue without considering the affidavit of John J. Virga.  For reasons explained above, Virga's affidavit does not fit within the three categories of materials that this Court can consider when Defendants merely contest the sufficiency of the pleadings.  Fund Defendants' citations suggesting otherwise miss the mark, and merely reinforce the long-standing practice described in *Newman*.  *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 808-09 (2d Cir. 1996) (holding that a district court may review an entire document if a portion of the document is quoted in the complaint); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-

## 2. Unlawful Discharge Under ERISA Section 510

Section 510 of ERISA ("Section 510"), 29 U.S.C. § 1140, makes it unlawful for any person to discharge or take other adverse action against employees for exercising their rights under an employee benefit plan or for the purpose of interfering with the attainment of any right to which employees may become entitled.[16]  As a second ERISA claim, Plaintiff alleges that Pocino, Proskauer, and Virga illegally interfered with his rights under Section 510.  (PSAC ¶¶ 136-96.)  Specifically, Plaintiff claims that he was preemptively and constructively discharged after Singh accused Plaintiff of sexual assault.  According to Plaintiff, he was improperly denied access to Fund records and improperly barred from attending a meeting of the Trustees as a result of Singh's allegations.  (Id. ¶¶ 138, 162-75, 178-92.)  Additionally, Plaintiff claims he was constructively discharged as retaliation for his whistle-blowing efforts to expose waste,

---

48 (2d Cir. 1991) (allowing the district court, in a securities action, to consider a prospectus).

[16]Section 510 of ERISA states, in relevant part, that:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C.A. § 301 et seq.], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.  It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to this chapter or the Welfare and Pension Plans Disclosure Act.

29 U.S.C. § 1140 (alteration in original).

21

corruption, and graft within the Fund, which Plaintiff says include Singh's allegations against Plaintiff. (*Id.* ¶¶ 137, 141-61, 176, 192.)

Section 510 of ERISA "was designed primarily to prevent unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1111 (2d Cir. 1988). "[A] § 510 claim involves three elements: 1) prohibited employer conduct; 2) taken for the purpose of interfering; 3) with the attainment of any right to which the employee may become entitled." *Hayes v. Compass Group USA, Inc.*, 343 F. Supp. 2d 112, 121 (D. Conn. 2004). "In order to prevail on a Section 510 claim, the plaintiff must demonstrate that an employer, in taking adverse employment action against the employee, 'was at least in part motivated by the specific intent to engage in activity prohibited by § 510.'" *Tavoloni v. Mount Sinai Med. Ctr.*, 26 F. Supp. 2d 678, 680 (S.D.N.Y. 1998) (quoting *Dister,* 859 F.2d at 1111). The Second Circuit has described the demonstration of specific intent under Section 510 as "[a]n essential element of plaintiff's proof under the statute . . . ." *Dister*, 859 F.2d at 1111.

### a.  Claim Against Fund Defendants and Proskauer

Plaintiff claims that Pocino, Proskauer, and Virga prevented him from attending meetings of the Trustees and denied him access to Fund records in response to Singh's allegations. In particular, Plaintiff claims that Virga falsely denied that a specific Trustees meeting had been scheduled, and subsequently withheld the minutes of that meeting from Plaintiff. (PSAC ¶¶ 165-66, 169.) Plaintiff alleges that Pocino told Plaintiff that Proskauer had advised Pocino to inform Plaintiff that Plaintiff was to "stay away from the Trust Funds and its employees." (*Id.* ¶ 172.) This directive, in effect, "suspended [Plaintiff] from the bulk of this [sic] salaried positions[,]"

and from ascertaining what Singh had said about Plaintiff. (*Id.* ¶ 173-75.) According to

Plaintiff, Pocino and Proskauer issued the directive to keep Plaintiff from "pursuing the welfare

fund fraud and the Singh matter." (*Id.* ¶ 176.)

For Plaintiff's claim to survive a motion to dismiss, he must plead that the Fund's

motivation for terminating his employment was to deny him a right protected under Section 510.

*See Vallone v. Banca Nazionale del Lavoro, NY Branch*, No. 02 Civ. 6064, 2004 WL 2912887,

at *2 (S.D.N.Y. Dec. 14, 2004) ("[A]n employer's intent is the central question under § 510");

*see also Blessing v. J.P. Morgan Chase & Co.*, No. 02 Civ. 3874, 2003 WL 470338, at *3

(S.D.N.Y. Feb. 24, 2003) (dismissing Section 510 claim because plaintiff did not "allege that he

was terminated in order to avoid paying him severance"). The courts of this District, as well as

the Second Circuit, have made clear that "no claim 'lies where the loss of pension benefits was a

mere consequence of, but not a motivating factor behind,' an adverse employment action."

*Tavoloni*, 26 F. Supp. 2d at 680 (quoting *Dister*, 859 F.2d at 1111); *see also Burke v. Gregory*,

356 F. Supp. 2d 179, 187 (N.D.N.Y. 2005) (dismissing a Section 510 claim because plaintiff

failed to demonstrate that her termination was motivated by her employer's desire to deprive her

of plan benefits); *Romano v. Verizon Commc'ns, Inc.*, No. 01 Civ. 6737, 2002 WL 472192, at *5

(S.D.N.Y. Mar. 27, 2002) ("Plaintiffs also fail to allege that the defendants acted with the intent

to prevent plaintiffs from attaining enhanced benefits.").

Plaintiff has not alleged, as the plain words of the statute require, that his rights were

impaired as a result of "exercising a[] right to which he is entitled under the provisions of an

employee benefit plan." 29 U.S.C. § 1140. Nor has he claimed that he was discharged in order

to "interfer[e] with the attainment of any right." *Id.* In addition, Plaintiff has failed to plead

adequately that his employer infringed on any of his protected rights. Only rights referenced in

Section 510, typically plan benefits, are protected. The fact that Plaintiff's benefits were

terminated after he was constructively discharged is not sufficient to plead the requisite intent to

sustain this claim. *See Kendall v. Fisse*, No. 00 Civ. 5154, 2004 WL 1196811, at *7 (E.D.N.Y.

May 25, 2004) ("Plaintiff must prove more than the simple fact that his termination precluded

him from vesting into a pension plan; he must also show that Citibank had an unlawful purpose

in firing him."). Even construing the PSAC broadly, and in a light most favorable to Plaintiff, it

is impossible to identify the right that Plaintiff's employer was denying to Plaintiff.[17] *See*

*McLellan v. E.I. DuPont de Nemours & Co., Inc.*, No. 04 Civ. 314, 2006 WL 3751583, at *20

(W.D.N.Y. Dec. 19, 2006) ("Nevertheless, relief under § 510 for adverse action taken for

exercising a right under the Plan is unavailable to McLellan who, according to a careful review

of the Complaint, fails to identify any such right exercised.").

　　　The "rights" that Plaintiff claims he was denied include the right to attend a Trustees'

meeting about allegations of criminal conduct by Plaintiff, to have access to Fund records, and,

presumably, to retain his status as a Trustee. These "rights," however, are not actionable under

Section 510. Section 510 protects employees from unscrupulous employers that seek to

improperly deny employees their pension rights. *See Dister*, 859 F.2d at 1111; *see also Quinby*

*v. WestLB AG*, No. 04 Civ. 7406, 2007 WL 1153994, at *15 (S.D.N.Y. Apr. 19, 2007) (finding

inference of discrimination when plaintiff was terminated two weeks before pension was to

vest); *Infantolino v. Joint Indus. Bd. of the Elec. Indus.*, No. 06 Civ. 520, 2007 WL 879415, at *8

---

　　　[17]This defect in Plaintiff's pleading applies with equal force to his claim that he was
constructively discharged in retaliation for his whistle-blowing efforts.

(E.D.N.Y. Mar. 15, 2007) (denying motion to dismiss when plaintiff alleged that his benefits

were terminated as retaliation for filing a discrimination lawsuit).  Section 510 is not a vehicle

for Plaintiff to challenge any Defendant's decision to bar Plaintiff from a Trustees' meeting that

was investigating Plaintiff's alleged criminal conduct, or the Trustees' ultimate decision to seek

Plaintiff's resignation.  *See Ancekewicz*, 2005 WL 1411917, at *8 ("ERISA's goal of protecting

[pension and other] benefits from interference does not transform ERISA's statutory scheme into

a federal job protection scheme." (quoting *Raymond v. Mobil Oil Corp.*, 983 F.2d 1528, 1539

(10th Cir. 1993)) (alteration in original).  Therefore, Plaintiff's Section 510 claim is futile.[18]

---

[18] Proskauer argues that the lack of an employment relationship between Plaintiff and
Proskauer bars the Section 510 claim.  While Proskauer correctly notes that "courts in this
District have held that § 510 only proscribes interference with the employment relationship,"
*Tirone v. New York Stock Exchange, Inc.*, No. 05 Civ. 8703, 2006 WL 2773862, at *3 (S.D.N.Y.
Sept. 28, 2006) (collecting cases), it does not necessarily follow that Proskauer could not
interfere with Plaintiff's employment relationship simply because it did not directly employ
Plaintiff.  *See Swanson v. U.A. Local 13 Pension Plan*, 779 F. Supp. 690, 700-01 (W.D.N.Y
1991) (noting that Section 510 reaches conduct which fundamentally changes the employer-
employee relationship so as to interfere with pension rights and that "not only employers may be
liable" of such conduct).  However, as Plaintiff has not adequately alleged the violation of any
right protected under Section 510, *supra*, the Court need not address the issue of whether
Proskauer, serving in an advisory role to Plaintiff's employer, could be held liable for such
conduct.
    Proskauer also argues that Plaintiff, while serving as a Trustee, had no actual
employment relationship with MTDC Funds (Fund Def.'s Br. in Supp. of Mot. to Dismiss
Second Am. Compl. at 18.)  When queried by the Court at oral argument on the instant Motion,
Plaintiff claimed that his employment relationship with MTDC Funds was evident throughout
the Amended Complaint, but could not point to any particular page where the employment
relationship was definitively stated.  (Hr'g Tr., Sept. 7, 2007.)  If Plaintiff never had an actual
employment relationship with MTDC Funds, Plaintiff's Section 510 claim would be futile.
However, as noted above, the Court need not resolve the dispute over Plaintiff's true
employment status as his claims are dismissed on other grounds.

b.  Union Defendants

The retaliation claim against Union Defendants,[19] however, is a different story.  Plaintiff has alleged that he has consistently reported fraud and abuse within the Fund, and, in particular, that he informed Virga that Joseph Giardina, and at least four others, were improperly receiving benefits.  (PSAC ¶¶ 144-52.)  Following up on this supposed complaint, Plaintiff alleges that he sought a meeting with a variety of LIUNA officials, including the Inspector General in late November 2004.  (*Id.* ¶¶ 152.)[20]  Plaintiff later objected to a recommendation to merely terminate the improper benefits, because Plaintiff thought that an audit was necessary to determine if others were improperly receiving benefits.  (*Id.* ¶¶ 153-61.)  Soon thereafter, Virga allegedly expressed his "displeasure" that Plaintiff had referred the matter to LIUNA.  (*Id.* ¶ 160.)  According to Plaintiff, it was soon after this series of events that Plaintiff was asked by Pocino in mid-March 2005 to resign from his LIUNA and GYNLECET positions, and it is to those positions (and not to any positions with the MTDCF) that Plaintiff seeks reinstatement.  (*Id.* ¶¶ 177, 188, and 196.)

"Whistle-blowers" are protected under Section 510 of ERISA from adverse employment actions relating to whistle-blowing activity.  The relevant portion of Section 510 provides that "[i]t shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against

---

[19]"Union Defendants" consists of LIUNA and Raymond Pocino, Vice President and Eastern Regional Manager of LIUNA, in his individual and official capacities.  Although Plaintiff's allegations against Union Defendants focus principally on Pocino, on at least one occasion Plaintiff alleges that Pocino was acting on behalf of LIUNA, an allegation which could be construed as a claim against LIUNA based on the theory of respondeat superior.  (PSAC ¶ 137.)  The Court cannot say that such an allegation would be futile.  However, Plaintiff would be well advised to clarify his theory of liability in his Amended Complaint.

[20]The PSAC lists two paragraphs as 152.   The cite above is to the second such paragraph.

any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to this chapter or the Welfare and Pension Plans Disclosure Act." 29 U.S.C. § 1140. It is unarguable that termination from employment is an adverse employment action covered by Section 510. However, Union Defendants argue that Plaintiff fails to allege that Union Defendants acted with the requisite intent to deprive plaintiff of some protected ERISA right or benefit, and that Plaintiff fails to allege that he engaged in protected conduct under Section 510.

Regarding the first point, "to prevail on a Section 510 claim, the plaintiff must demonstrate that an employer, in taking adverse employment action against the employee, 'was at least in part motivated by the specific intent to engage in activity prohibited by § 510.'" *Tavolini*, 26 F. Supp. 2d at 680 (quoting *Dister*, 859 F.2d at 1111). According to Union Defendants, Plaintiff has failed to satisfy this element because he only has alleged that he was deprived of his rights as a Trustee of the Fund, and because any actions by Pocino were in not in his Union capacity. Relatedly, Union Defendants argue that Plaintiff's alleged whistleblower activities related only to the operation of the Fund, and not to the operation of LIUNA. These arguments, while potentially dispositive at the summary judgment stage, fail to demonstrate that Plaintiff's proposed amendment is futile. While some of Plaintiff's allegations involve limits on his role as a Trustee of the Fund, and by themselves do not make out a Section 510 claim, the core of his claim is that he lost his job at LIUNA because of his complaints regarding fraudulent administration of the Fund. And while the PSAC is a little vague about which capacity Pocino was acting when he sought Plaintiff's resignation, it cannot be said that Plaintiff's allegations regarding Pocino's motives, or what hat he was wearing, bar the claim. Thus, given the

27

plausibility of Plaintiff's claims regarding Pocino's conduct, and, in particular, the motives for that conduct, the scope of Plaintiff's whistle-blower activities is best left for either summary judgment or a trial.

Defendant's second point asks whether Plaintiff's whistle-blowing activities involved an "inquiry" for purposes of Section 510. Here, Plaintiff is helped by the Second Circuit's decision in *Nicolaou v. Horizon Media*, 402 F.3d 325, 330 (2d Cir. 2005), in which the Court held that "the proper focus is not on the formality or informality of the circumstances under which an individual gives information, but rather on whether the circumstances can fairly be deemed to constitute an 'inquiry'" and thus be entitled to protection under Section 510. Plaintiff adequately alleges, though just barely, that he sought meetings with several individuals, including the LIUNA Inspector General, to provide information about suspected fraud in benefits disbursement. While Plaintiff does not allege he was responding to, or providing information to, a formal inquiry, Plaintiff's claims regarding his alleged efforts at scheduling a meeting with decision-makers and those who might begin a formal inquiry, could constitute a Section 510 claim. *Id.* (noting that allegations that Plaintiff met with outside counsel and the employer's president sufficient to state a claim under Section 510). Thus, Plaintiff's proposed amendment to his second cause of action against Union Defendants may proceed, but his allegations regarding Proskauer and Fund Defendants may not.

### C.  Civil RICO

Plaintiff alleges that Proskauer, Virga, Pocino, O'Brien, and Carron, acting individually and in concert, committed illegal acts which constitute violations of RICO. Plaintiff alleges that the MTDCTF is the RICO enterprise. Although Plaintiff alleges a total of nineteen racketeering

acts, these allegations can be reduced to a group of four allegations.  First, Plaintiff claims that

Virga allowed former members of the Union, who had been proscribed from receiving benefits

pursuant to a court order, to continue to receive benefits.[21]  (PSAC ¶¶  215-52.)  Second, Plaintiff

alleges that Proskauer illegally received compensation for its representation of the MTDCTF in

Plaintiff's dispute with Singh and in connection with Proskauer's efforts in this case.[22]  (*Id.* ¶¶

253-57.)  Third, Plaintiff alleges that Proskauer gave illegal gifts to Pocino, Virga, O'Brien, and

Carron.[23]  (*Id.* ¶¶ 258-84.)  Finally, Plaintiff pleads that the above-named Defendants all

conspired to engage in the illegal conduct described in the PSAC.[24]  (*Id.* ¶ 285.)  Plaintiff

contends that this illegal activity has injured him in two ways: first, he argues that he is liable for

the losses of the MTDCTF as a result of the illegal activity (*id.* ¶ 205); and second, he claims

that his property interest in the Pension Plan and Welfare Fund has been harmed because "every

dollar of loss is a dollar that is unavailable to pay benefits to plaintiff and his dependents" (*id.* ¶

206).

    The elements of a RICO claim under 18 U.S.C. § 1962(c) are that:  (1) defendants

through the commission of two or more predicate acts; (2) constituting a "pattern"; (3) of

---

[21]Plaintiff claims that Virga violated the following federal statutes: 18 U.S.C. § 664 (theft or embezzlement from employee benefit plan); 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (fraud by wire, radio, or television); and 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from unspecified unlawful activity).

[22]Plaintiff claims that Proskauer violated 18 U.S.C. § 664 (theft or embezzlement from employee benefit plan).

[23]Plaintiff claims that Proskauer, Pocino, Virga, O'Brien and Carrion violated 18 U.S.C. § 1954 (offer, acceptance, or solicitation to influence operations of employee benefit plan).

[24]Plaintiff claims that Defendants violated 18 U.S.C. § 1962(d) ([RICO] prohibited activities).

"racketeering activity"; (4) directly or indirectly invested in, or maintained an interest in, or participated in; (5) an "enterprise"; (6) the activities of which affect interstate or foreign commerce.  *See Nat'l Group for Commc'n & Computers Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 270 (S.D.N.Y. 2006).[25]  Plaintiff must establish each element as to each individual defendant.  *Id.* at 270 n.28.  "In order to have standing, plaintiff must also show that injuries to its business or property were 'proximately caused by a pattern of racketeering activity violating Section 1962 or by individual RICO predicate acts.'"  *Id.* at 270 (quoting *Lerner v. Fleet Bank N.A.*, 318 F.3d 113, 122-23 (2d Cir. 2003)).

Defendants argue that Plaintiff lacks standing to pursue a civil RICO claim because he has not pled a sufficient injury.  Defendants also argue that the PSAC does not allege any racketeering activity and that Plaintiff has failed to plead operation and control of the alleged enterprise.  Indeed, there are more holes in Plaintiff's RICO cause of action than in the proverbial piece of swiss cheese.  However, because the Court agrees with Defendants that Plaintiff lacks standing under RICO to bring this claim, the Court need not reach these other deficiencies.

Civil RICO allows "[a]ny person injured in his business or property by reason of a violation of Section 1962" to sue for treble damages and attorneys' fees.  18 U.S.C. § 1964(c).  "From this language, courts have extracted the conditions a plaintiff must meet to satisfy RICO's

---

[25]18 U.S.C. § 1962(c) states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

standing requirements: '(1) a violation of Section 1962; (2) injury to business or property; and (3) causation of the injury by the violation.'" *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 767 (2d Cir. 1994) (quoting *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990)).  Plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *accord First Nationwide*, 27 F.3d at 768. Furthermore, Plaintiff must show that the alleged racketeering was both the proximate and "but-for" cause of his injuries.  *See First Nationwide*, 27 F.3d at 769.

The alleged injury claimed here is two-fold.  First, Plaintiff claims that he, presumably as a former fiduciary, is liable for any losses incurred as a result of Defendants' alleged racketeering activity.  Second, Plaintiff claims that his personal property interest in the Pension and Welfare Plans has been injured because every dollar lost is a dollar that is no longer available to pay his benefits.  Neither of these allegations is sufficient to state a claim for standing under RICO.

Plaintiff's putative liability as a former Trustee is not sufficient to claim an injury under RICO.  "[A]s a general rule, a cause of action does not accrue under RICO until the amount of damages becomes clear and definite." *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003); *First Nationwide*, 27 F.3d at 768.  Any potential liability that Plaintiff may incur as a former Trustee has yet to materialize.  A civil RICO action can only be brought when a plaintiff's "actual loss becomes clear and definite." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006); *Motorola Credit Corp.*, 322 F.3d at 136; *First Nationwide*, 27 F.3d at 769. Thus, Plaintiff's claim that he has been injured because he may face a lawsuit in the future is not

an injury under RICO.  *See Hecht*, 897 F.2d at 24 (holding that claim for loss of future

commissions was "too speculative to confer standing").

      Plaintiff also fails to adequately plead standing based on any losses suffered by the

Union because he has not pled any losses suffered as a *direct* injury to his business or property as

a result of the alleged RICO violation.  *See Laborers Local 17 Health & Benefit Fund v. Philip*

*Morris, Inc.*, 191 F.3d 229, 235 (2d Cir. 1999) (holding that pleading a "direct injury" is

necessary for establishing proximate causation in a RICO action).  The potential *direct* losses

alleged here would be borne by the Union – any *indirect* injury to Plaintiff at some unknown

point in the future is too attenuated to confer standing under RICO.  *See Commer v. Am. Fed'n*

*of State, County & Mun. Employees*, No. 01 Civ. 4260, 2003 WL 21697873, at *3 (S.D.N.Y.

July 22, 2003) (holding that injuries suffered by a third-party union did not confer standing upon

one of its former members to sue under RICO for losses incurred by all of the union's members);

*Mayes v. Local 106*, No. 93 Civ. 716, 1999 WL 60135, at *3 (N.D.N.Y. Feb. 5, 1999) ("A

plaintiff cannot bring a civil suit under RICO, in a personal capacity, where the injury he alleges

has been incurred by a union of which he is a member and any derivative injury to him is no

different from that sustained by similarly situated members of the same union."), *aff'd*, 201 F.3d

431 (2d Cir. 1999).  Plaintiff, therefore, lacks standing in his capacity as a Plan participant to sue

under RICO.  The RICO cause of action is thus futile.

D.  Defamation

Plaintiff's final cause of action is for defamation against Rossein, Proskauer, Pocino, Singh, and Columbia.  (SPSAC ¶ 289.)[26]  Plaintiff claims that these Defendants defamed him by making false statements in connection with the investigation of Singh's allegations of sexual assault against Plaintiff.

To state a claim for defamation under New York law, Plaintiff must establish: "(1) that a defamatory statement of fact was made concerning [Plaintiff]; (2) that the defendant published that statement to a third party; (3) that the statement was false; (4) that there exists some degree of fault; (5) and that there are special damages or that the statement is defamatory *per se*, i.e. it disparaged the plaintiff in the way of his or her office, profession or trade."  *Muzio v. Inc. Village of Bayville*, No. 99 Civ. 8605, 2006 WL 39063, at *8 (E.D.N.Y. Jan. 3, 2006).  The Court will consider the alleged defamatory statements made by each Defendant.

 "While the defamation need not be plead *in haec verba*, 'a pleading is only sufficient if it adequately identifies the purported communication, and an indication of who made the statement, when it was made, and to whom it was communicated.'"  *Camp Summit of Summitville, Inc.*, No. 06 Civ. 4994, 2007 WL 1152894, at *10 (S.D.N.Y. Apr. 16, 2007) (quoting *Scholastic, Inc. v. Stouffer*, 124 F. Supp. 2d 836, 849 (S.D.N.Y. 2000)).  "The central concern is that the complaint afford defendant sufficient notice of the communications complained of to enable him to defend himself."  *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986) (citations omitted).  Thus, "[m]ere conclusory statements that the claimant was disparaged

---

[26]Defamation includes slander, which is spoken, and libel, which is written.  *See Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001) (stating that "spoken defamatory words are slander; written defamatory words are libel").

by false statements are insufficient to state a defamation claim." *Scholastic*, 124 F. Supp. 2d at
849; *see also Ford v. Clement*, 834 F. Supp. 72, 78 (S.D.N.Y. 1993) (holding that allegations of
defamation were insufficient where they failed to "give [defendant] any notice whatsoever of the
communications at issue"), *aff'd*, 29 F.3d 621 (2d Cir. 1994). The Court will consider the
alleged defamatory statements made by each Defendant.

### 1. Rossein

Merrick Rossein was retained by Proskauer on behalf of the Funds to investigate Singh's
allegations against Plaintiff and to issue a report detailing his findings ("Rossein Report" or
"Report"). Plaintiff claims that the Rossein Report is libelous, but doesn't identify any particular
portion of the report as containing the libelous material. The Court will liberally construe
Plaintiff's claim to encompass the entire Report.[27]

Fund Defendants argue that the contents of the Rossein Report are protected by a
qualified privilege. Under New York law, a "conditional, or qualified, privilege extends to a
'communication made by one person to another upon a subject in which both have an interest.'"
*Liberman v. Gelstein*, 605 N.E.2d 344, 349 (N.Y. 1992) (quoting *Stillman v. Ford*, 22 N.Y.2d 48,
53 (1968)). In the employment context, the qualified privilege is recognized as protecting the
free flow of information. *See Dunson v. Tri-Maintenance & Contractors, Inc.*, 171 F. Supp. 2d
103, 116-17 (E.D.N.Y. 2001). Communications regarding alleged employee misconduct are

---

[27]Although the entire Report is not reproduced in the SPSAC, it is both referred to in the
SPSAC and integral to the PSAC, so the Court will consider the contents of the Report. *See
Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is
not incorporated by reference, the court may nevertheless consider it where the complaint 'relies
heavily upon its terms and effect,' which renders the document 'integral' to the complaint."
(quoting *Int'l Audiotext Network, Inc. v. AT&T*, 62 F.3d 69, 72 (2d Cir. 1995)); *see also San
Leandro*, 75 F.3d at 808.

covered by the privilege. *See Loksen*, 239 F.3d at 272. However, a defendant can forfeit the privilege "by making a false, defamatory statement with malice of either the common-law or constitutional variety." *Id.*; *see also Liberman,* 605 N.E.2d at 350 (explaining that a finding of either form of malice defeats the privilege). "Common-law malice is based on the traditional concept of spite or ill will, while constitutional malice or 'actual' malice refers to publication of false material with knowledge of its falsity, or a high degree of awareness of the falsity." *Dunson*, 171 F. Supp. 2d at 117. Plaintiff must show malice based on a preponderance of the evidence. *See id.*

Plaintiff has failed to adequately plead that Rossein's Report satisfies either common-law malice or actual malice. To establish common-law malice, Plaintiff must show that Rossein's ill will towards Plaintiff was "the one and only cause for the publication . . . ." *Loksen*, 239 F.3d at 272 (internal quotations and citation omitted). Thus, for Plaintiff to show common-law malice, he must show that Rossein issued the Report solely to harm Plaintiff. The SPSAC does not make that allegation. As an initial matter, Rossein was retained as an outsider to conduct an investigation into Singh's allegations against Plaintiff. (SPSAC ¶ 320.) When Rossein was retained, he was a stranger with no motive to harm Plaintiff and Plaintiff has not pled that Rossein subsequently developed any animus towards Plaintiff. *See Brattis v. Rainbow Adver. Holdings, L.L.C.*, No. 99 Civ. 10144, 2000 WL 702921, at *6 (S.D.N.Y. May 31, 2000) (stating that a finding of personal animus is necessary to establish common-law malice). Plaintiff contends that Rossein's Report was one-sided, even though the SPSAC documents Rossein's attempt to interview Plaintiff before he issued his report. (SPSAC ¶ 351.) According to the SPSAC, after Rossein spoke to Plaintiff's counsel, Rossein agreed to meet with Plaintiff and

Plaintiff's counsel on April 6, 2005. (*Id.* ¶¶ 352-53.) Plaintiff acknowledges, however, that it

was Plaintiff's counsel who advised Plaintiff to refuse to meet with Rossein on the day of their

scheduled meeting. (*Id.* ¶ 353.) Based solely on the facts pled in the SPSAC, it is apparent that

Rossein omitted Plaintiff's version of the events from the Report because Plaintiff, upon advice

of counsel, refused to meet with Rossein. (*Id.*) Notwithstanding these facts, Plaintiff remarkably

claims that Rossein's Report is defamatory because it fails to take Plaintiff's side of the story

into account. (SPSAC ¶¶ 362-89.) The merits of the Rossein Report, however, are not at issue;

the question, rather, is whether Rossein issued his report strictly out of ill-will towards Plaintiff.

Nothing in the SPSAC even suggests an affirmative answer to that question. If anything, the

SPSAC supports the opposite inference.

The same conclusion follows under the actual malice standard, which asks whether

Rossein knew that the defamatory statements in his Report were false, or had a high degree of

awareness that they were false. Again, Plaintiff's refusal to meet with Rossein made it

impossible for Rossein to credit Plaintiff's version of Singh's allegations. (SPSAC ¶ 372.)

Moreover, Plaintiff cannot claim actual malice under these circumstances, because "[i]t is well

settled that a defendant's failure to investigate before making defamatory statements does not

support a finding of actual malice." *Boyd v. Nationwide Mut. Ins. Co.*, 208 F.3d 406, 408 (2d

Cir. 2000) (citing *Harte-Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 666-67

(1989)); *accord Brattis*, 2000 WL 702921, at *5.[28] In any event, Rossein's Report is certainly

more thorough than other employer-generated, investigative reports that have enjoyed the

---

[28]The Court does not mean to suggest that Rossein failed to investigate Plaintiff's side of the story, but even if Platiniff's allegations could be construed to suggest such a claim, they would be futile as a matter of law based on Plaintiff's own allegations.

employer's qualified privilege. *See Dunson*, 171 F. Supp. 2d at 117 (questioning the accuracy or conclusions drawn in a report not enough to defeat privilege). In addition, Plaintiff also fails to plead that Rossein knew the conclusions in his Report were false or that he was aware of a likelihood of falsity.

### 2. Proskauer

Proskauer is alleged to have defamed Plaintiff three times. (SPSAC ¶¶ 390-406.) First, Plaintiff alleges that Detective Whelan "told plaintiff that [Kathleen] McKenna, [a partner at Proskauer,] telephoned him repeatedly regarding the charges and made statements evidencing her belief in plaintiff's guilt" in connection with the Singh episode. (SPSAC ¶ 315.)[29] Second, Plaintiff claims that McKenna defamed Plaintiff in a letter setting out the Rossein Report's findings which was sent to Plaintiff's counsel on June 28, 2005. (*Id.* ¶ 397.) Third, Plaintiff claims that a letter sent to Assistant District Attorney Willa Concannon, which included a copy of the Rossein Report in response to a subpoena, contained defamatory statements. (*Id.* ¶ 404.)

The first claim is deficient for it utterly fails to identify what McKenna is alleged to have said to Detective Whelan, let alone even estimate when she is alleged to have made any particular statements to the Detective. Instead, the only allegation is that Detective Whelan supposedly told Plaintiff that McKenna made statements "evidencing her belief in plaintiff's guilt" in connection with the Singh episode. Yet, there is not a single reference to what

---

[29] Even more generically, Plaintiff alleges that McKenna "has knowingly submitted false and defamatory information to law enforcement and judicial authorities." How Ms. McKenna could possibly defend against such an amorphous allegation is a mystery, and, therefore, it does not even come close to stating a claim. *See Reilly v. Natwest Markets Group, Inc.*, 181 F.3d 253, 271 (2d Cir. 1999) (affirming dismissal of plaintiff's bare claim that defendant "said 'something bad' about him to client").

McKenna actually said.  Indeed, it is entirely unclear if Detective Whelan interpreted whatever McKenna said properly, or if he based his conclusion about McKenna's belief in Plaintiff's guilt from something other than McKenna's actual words, such as her tone of voice.  And because Plaintiff has not provided any information regarding when Detective Whelan and McKenna had these conversations, the Court concludes that this claim of defamation fails to state a claim and therefore is futile.  *See Scholastic*, 124 F. Supp. 2d at 850 (dismissing defamation claim which failed to identify when and where the allegedly defamatory statements were made); *Broome v. Biondi*, No. 96 Civ. 805, 1997 WL 83295, at *3 (S.D.N.Y. Feb. 10, 1997) ("While defendants adequately identify the purported communication and who said such statements, defendants fail to sufficiently indicate when the communications took place and to whom these defamatory words were said . . .").

   The second claim Plaintiff makes relates to a June 28, 2005 letter McKenna sent to counsel for Plaintiff.  According to Plaintiff, this letter was written in response to a letter sent by Plaintiff's counsel accusing the Union and Fund Defendants (and Proskauer) of violating Plaintiff's statutory and common law rights.  Plaintiff's claim regarding the June 28, 2005 letter fails, however, because he does not allege that the contents of the letter are false, let alone how they are otherwise defamatory.  "A plaintiff in a libel action must identify a plausible defamatory meaning of the challenged statement or publication."  *Celle v. Filipino Reporter Enterps., Inc.*, 209 F.3d 163, 178 (2d Cir. 2000).  "Whether a statement is susceptible of a defamatory meaning is a threshold question of law to be resolved by the court.  If the statement complained of is susceptible of more than one meaning, at least one of which is defamatory, the claim must go to the jury."  *Netzer v. Continuity Graphic Assocs., Inc.*, 963 F. Supp. 1308, 1324 (S.D.N.Y. 1997).

Under New York law, a statement will be found defamatory only if it "tend[s] to expose one to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace, or to induce an evil opinion of one in the minds of right-thinking persons, and to deprive one of their confidence and friendly intercourse in society." *Fairley v. Peekskill Star Corp.*, 445 N.Y.S.2d 156, 158 (App. Div. 1981).

The block-quoted portions of the June 28, 2005 letter in the PSAC say nothing defamatory about Plaintiff. In essence, this letter states: (i) that Proskauer represents the Funds; (ii) that Plaintiff's counsel's letter contains inaccuracies regarding Plaintiff's departure from the Union; (iii) that Plaintiff's cooperation with the investigation by Mr. Rossein might have better informed counsel about the facts and circumstances of the investigation (while detailing Rossein's unsuccessful efforts to interview Plaintiff); and (iv) that McKenna believes that the Funds committed no violation of Plaintiff's statutory or common law rights. In short, Plaintiff identifies nothing about the contents of this letter that defames him, even if the contents of the letter were untrue, and even if McKenna knew them to be untrue. Nor does Plaintiff's conclusory allegations that McKenna or Proskauer intended to defame Plaintiff save this particular allegation. *See Scholastic*, 124 F. Supp. 2d at 849-50 (noting insufficiency of conclusory allegation that plaintiff was defamed by false statements). Thus, it would be futile for Plaintiff to proceed on this claim.

Finally, there is nothing actionable about Proskauer's production of the Rossein Report to the Assistant District Attorney, as that production was absolutely privileged. According to the Second Circuit, "[v]intage case law demonstrates that New York bestows an absolute privilege upon those whom the government compels to give evidence." *Boice v. Unisys Corp.*, 50 F.3d

39

1145, 1149 (2d Cir. 1995). This absolute privilege attaches when "(1) the disclosure was compelled by subpoena; (2) the disclosure materially responded to the subpoena; and (3) the person did not set the investigation in motion, or otherwise manipulate the investigative process to promote the libel." *Boice*, 50 F.3d at 1149. The first factor–that the disclosure was compelled by a subpoena–is conceded by Plaintiff when he quotes McKenna's letter to the Assistant District Attorney in the SPSAC, without disputing McKenna's claim that she was producing the Report in response to a subpoena. (SPSAC ¶ 404.) Nor does Plaintiff claim that the production of the Report exceeded the scope of the subpoena, leaving only the third factor to consider. The PSAC is not clear, however, on the third factor. Plaintiff claims that McKenna informed the District Attorney's office after April 27, 2005, though the date is not specified, that Rossein had prepared a report on Singh's sexual assault claim. (*Id.* ¶ 399.) The SPSAC does not allege, however, that McKenna set the investigation in motion or that she manipulated the police investigation. In fact, the SPSAC acknowledges that the investigation was initiated by Singh in February 2005, and that a detective was assigned to investigate Singh's allegations. (*Id.* ¶ 309.) Accordingly, by Plaintiff's own pleadings, it is clear that law enforcement officials learned about Singh's allegations from Singh and initiated the investigation on their own. Thus, McKenna's production of the Rossein report and her provision of other information to the District Attorney's Office was absolutely privileged, thus making Plaintiff's allegation on this point futile.

### 3. Pocino

Pocino is alleged to have defamed Plaintiff by "doing Proskauer's bidding and ostracizing him" and by "treat[ing] plaintiff as if though he was guilty" which created the "false

impression that plaintiff, was, in fact, guilty."  (SPSAC ¶¶ 299-300.)  Pocino also is alleged to have provided Rossein false and misleading information.  (*Id.* ¶ 301.)

      The Court will consider the first group of allegations as claiming defamation by implication, since Plaintiff has not pled that Pocino said anything defamatory, with the exception of his statements to Rossein.  "Defamation by implication involves 'false suggestions, impressions and implications arising from otherwise truthful statements.'"  *Levin v. McPhee*, 119 F.3d 189, 196 n.5 (2d Cir. 1997) (quoting *Armstrong v. Simon & Schuster, Inc.*, 649 N.E.2d 825, 829 (N.Y. 1995)).  Neither the New York Courts nor the Second Circuit has specifically identified the pleading elements of defamation by implication.  *See Levin*, 119 F.3d at 196 n.5; *see also Roberti v. Schroder Inv. Mgmt N. Am., Inc.*, No. 04 Civ. 2404, 2006 WL 647718, at *9 (S.D.N.Y. Mar. 14, 2006).  The Court has found no case law, however, suggesting that a claim for defamation by implication relieves Plaintiff of identifying the allegedly defamatory words that were uttered and to whom they were directed.

      Plaintiff's claim that Pocino did Proksauer's bidding, treated him as though Plaintiff was guilty, and created the impression he was guilty are futile, because Plaintiff has not identified a statement or writing from which the alleged defamation arose.  In *Armstrong*, the New York Court of Appeals described *Memphis Publ. Co. v. Nichols*, 569 S.W.2d 412 (Tenn. 1978) as "illustrative" of defamation by implication.  In *Nichols*, the alleged defamation was a newspaper article.  Although the plaintiff in *Nichols* was suing based on a defamatory implication arising from the article, the Court finds it instructive that the implication arose from a finite collection of identifiable words reproduced in print.  Thus, the Court reads *Armstrong* to require Plaintiff to identify the exact words that Plaintiff believes were uttered in order to adequately support a

41

claim of defamation by implication.  Furthermore, in cases alleging defamation by implication, "[p]laintiffs typically have to show that [d]efendants affirmatively intended such implication." *Vinas v. Chubb Corp.*, 499 F.Supp. 2d 427, 437 (S.D.N.Y. 2007).  The SPSAC does not sufficiently plead that Pocino intended to impugn Plaintiff.  Plaintiff pleads that Pocino made false statements willfully and maliciously, but he offers nothing more than this conclusory statement to support his allegation.  Simply reciting the elements of claim in a complaint, as Plaintiff has done here, is not sufficient to defeat a Rule 12(b)(6) motion.  *See Bell Atl.*, 127 S. Ct. at 1964-65.  And to the extent that Pocino's conduct or words were solely directed at Plaintiff, those claims are dismissed because they were not published to a third party.  *See Muzio*, 2006 WL 39063, at *8 (explaining that publication to a third party is a required element of a defamation claim).

Finally, the allegation that Pocino provided Rossein with false information cannot be construed as a claim for defamation by implication, but simply as a claim for defamation.  This claim is futile because Plaintiff has not identified the allegedly defamatory words or writings that Pocino passed on to Rossein.  Additionally, anything Pocino said to Rossein for the purposes of Rossein's investigation is protected by a qualified privilege, *see Loksen*, 239 F.3d at 272, and Plaintiff has not sufficiently pled actual or common-law malice with respect to Pocino.

### 4.  Singh

Plaintiff alleges that Singh "willfully and maliciously provided false information to law enforcement authorities with the intent to have plaintiff arrested and prosecuted."  (SPSAC ¶ 408.)  He further alleges that "Singh willfully and maliciously provided false information to the Funds and Rossein to bolster his criminal complaint."  (*Id.* ¶ 409.)

42

The allegations against Singh fail to state a claim and are thus futile. "In evaluating the sufficiency of claims of slander, the courts in this Circuit have required that the complaint adequately identify the allegedly defamatory statements, the person who made the statements, the time when the statements were made, and the third parties to whom the statements were published." *Mobile Data Shred, Inc. v. United Bank of Switzerland*, No. 99 Civ. 10315, 2000 WL 351516, at *6 (S.D.N.Y. Apr. 5, 2000). The SPSAC does not identify the particular statements made by Singh that Plaintiff believes are defamatory. The SPSAC merely claims that Singh made false statements to others, but neglects to identify what Singh actually said. Moreover, Plaintiff has to identify the recipients of the slander. *See id.* at *6-7 (dismissing slander claim for failing to identify the identity of recipients). In sum, the allegations against Singh lack sufficient detail regarding both the content and recipient of the statements to survive a Rule 12(b)(6) motion to dismiss, and thus may not go forward.

### 5. Columbia

Plaintiff claims that the LECET Director, Christopher Columbia, committed slander when he told other LECET "personnel" that "he believed Singh's allegations," that Ello engaged in "'shady' dealings," and that Ello "had been living with a man for 12 years." (PSAC ¶ 406.)[30] Plaintiff also alleges that in the Fall of 2005, Columbia knew that one of his "subordinates created and posted on the union computer system a calendar and other document which included an image of plaintiff's head on the body of an obviously homosexual man." (*Id.* ¶ 407.)

These allegations fail to state a claim and are futile for a number of reasons. First,

---

[30]The SPSAC contains two paragraphs numbered "406." These statements come from the second such paragraph.

Plaintiff fails to identify to whom these statements were made, or the time and manner in which they were made. *See United Bank of Switzerland*, 2000 WL 351516, at *6-7. Second, comments made in the employment context, such as those discussed above in regard to the Rossein Report, are entitled to qualified immunity from suit for defamation. On the basis of Plaintiff's SPSAC, Columbia's alleged statements were made in the employment context, and Plaintiff has not pled that they were made with actual or common-law malice. Nor has Plaintiff pled that Columbia's disclosures exceeded the scope of interested recipients. *See Milam v. Herrlin*, 819 F. Supp. 295, 304 (S.D.N.Y. 1993) (holding that communications to interested employees regarding the results of an employer's investigation of misconduct were protected by qualified privilege); *Rosen v. Piluso*, 652 N.Y.S.2d 104, 105 (App. Div. 1997) (explaining that a letter to the editor did not fall under a qualified privilege because the wide scope of the communication exceeded the acceptable scope of interested persons). Columbia enjoys protection of qualified immunity from suit; as a result, these statements are not actionable. *See Esser v. T-Mobile USA, Inc.*, No. 03 Civ. 9485, 2004 WL 1276839, at *2 (S.D.N.Y. June 8, 2004) (granting motion to dismiss in libel case on grounds of qualified privilege). Third, Columbia's purported statement that Plainitff engaged in shady dealings is not definite enough to state a claim. *See Reilly*, 181 F.3d at 271 (holding that claim that "something bad" had been said about plaintiff failed to state a claim and afford adequate notice to defendant).

Plaintiff's claim that Columbia's subordinates posted a defamatory picture of him also fails to state a claim in regard to Columbia. Under New York law, an employer can be held liable for its subordinates' statements under the theory of respondeat superior if those statements were made in the course of performance of the employee's duties. *See Rausman v. Baugh*, 682

44

N.Y.S.2d 42, 43 (App. Div. 1998); *see also Riviello v. Waldron*, 391 N.E.2d 1278, 1280-81

(N.Y. 1979) (discussing respondeat superior in the employer/employee context).  Although

"[t]here is no single mechanical test to determine whether at a particular moment an employee is

engaged in the employer's business[,]" *Rausman*, 682 N.Y.S.2d at 43, the following factors have

been identified as important to the inquiry:  (1) whether the employee's act fell within the

discretion and control of the employer; (2) whether the employee acted under the express or

implied authority of the employer; (3) whether the employee's act was in furtherance of the

employer's interests; (4) whether the employee's acts were in the "discharge of duty" to the

employer; (5) whether the act was in execution of the employer's orders or part of the work

assigned by the employer; and (6) whether the acts were "so closely connected" with what the

employee was hired to do, and "so fairly and reasonably incidental to it, that they may be

regarded as methods, even though quite improper ones, of carrying out the objectives of

employment." *Id.* at 43-44 (internal citations omitted).  In addition, courts have noted that "there

is no respondeat superior liability for torts committed for personal motives unrelated to the

furtherance of the employer's business."  *Murray v. Watervliet City School Dist.*, 515 N.Y.S.2d

150, 152 (App. Div. 1987) (internal quotations and citation omitted).

     The extent of the allegations against Columbia is that he "knew" that some subordinates

had posted a picture of Plaintiff on the computer system.  (SPSAC ¶ 407.)  This allegation is not

enough to implicate any of the six factors identified above, which means that Plaintiff has no

claim against Columbia based on respondeat superior.  If any claim lies here at all, it is against

the person or persons who created and uploaded the image, who may have done so for their own

reasons. *See Murray*, 515 N.Y.S.2d at 152.  Thus, this claim is also futile.

E.  Protective Order

Proskauer requests that limited portions of the Parties' submissions be sealed.  In

particular, Proskauer notes several paragraphs in the PSAC, ¶¶ 64, 69 and 96, where Plaintiff

divulges legal advice given by Proskauer to the MTCDTF that Plaintiff learned in his prior role

as trustee.  Proskauer also argues that Plaintiff's consistent "mudslinging" warrants a protective

order denying public access.

There is a general presumption in favor of public access to judicial records.  This

presumption is based on the need to hold the federal courts accountable to the public and to

foster confidence in the administration of justice.  *See United States v. Amodeo*, 71 F.3d 1044,

1048 (2d Cir. 1995) ("*Amodeo II*").  Although courts have a variety of internal checks –

appellate review, in particular – public monitoring is an essential method for imposing

democratic control and deterring arbitrary judicial behavior.  *See id*.  Such public monitoring,

however, is impossible without access to the testimony and documents used by the courts in the

performance of their Article III functions.  *See id*.

 In *Lugosch v. Pyramid Co. of Onondaga*, the Second Circuit enumerated the steps that a

district court must take when determining whether to issue a protective order denying public

access to records.  435 F.3d 110 (2d Cir. 2006).[31]  First, a court must determine whether the

---

[31] The Court has analyzed Proskauer's requests in light of the common law right of
access, not a constitutional right of access.  In *Lugosch*, the Second Circuit held that "there exists
a qualified First Amendment right of access to documents submitted to the court in connection
with a *summary judgment* motion."  *Lugosch,* 435 F.3d at 124 (emphasis added).  The court then
noted that a constitutional right of access necessitated a more strict balancing test for keeping
records under seal.  Whereas under the common law documents may be kept under seal if
"countervailing factors" are shown, the constitutional analysis requires "specific, on-the-record
findings that sealing is necessary to preserve higher values" and a sealing order which is
"narrowly tailored to achieve that aim."  *Id*.  The court in *Lugosch* resisted determining,

46

documents are "judicial documents." *Id.* at 119. To qualify as a judicial document, "'the item filed must be relevant to the performance of the judicial function and useful in the judicial process.'" *Id.* (quoting *Amodeo II*, 44 F.3d at 145). If the documents are deemed non-judicial, then there is no presumption of public access, and the movant need only make a baseline showing of good cause in order to justify the imposition of a protective order. *See Standard Inv. Chateau*, No. 07 Civ. 2014, 2007 WL 2790387, at *3 (S.D.N.Y. Sept. 26, 2007). If, however, the court determines that the documents are judicial in nature, there is a presumption of public

---

however, whether the attorney-client privilege was a sufficiently compelling reason to satisfy the "higher values" and "narrow tailoring" required to seal documents under the First Amendment. *Id.* at 125 (noting that "the attorney-client privilege might well be such a compelling reason" to seal documents covered by the constitutional right to access). The court remanded the case, in part, to further develop the facts in connection with this particular point of law.

    Upon remand, Magistrate Judge Treece recommended that the attorney-client privilege and work product doctrine were "the highest values within our judicial system and constitute compelling reasons, under the First Amendment, and countervailing factors, under the common law, that sufficiently outweigh the public's right of access." *Lugosch v. Congel*, No. 00 Civ. 0784, 2006 WL 931687, at *36 (N.D.N.Y., Mar. 07, 2006). Magistrate Treece qualified this recommendation, however, by stating that a party could not attempt to seal a document on privilege grounds if the party requesting the protective order was the same party that interjected the privileged documents into the litigation. *Id.* at *23 (noting that waiver of the privilege only occurs when the party that claims the privilege interjects the privileged material into the litigation).

    This line of precedent is still developing. The Second Circuit has not yet determined whether a constitutional right of access exists in regard to judicial documents other than those relating to summary judgment, such as the Motion to File the PSAC in the instant case. In fact, at least one court has ruled that certain documents submitted in connection with a rule 12(b)(6) motion to dismiss are not "judicial," and therefore not covered by a constitutional right of access. *See Standard Inv. Chateau*, No. 07 Civ. 2014, 2007 WL 2790387, at *7-8 (S.D.N.Y. Sept. 26, 2007). If, however, such a right does exist, the protective order requested by Proskauer appears to fit comfortably within the emerging constitutional analysis developed in the two *Lugosch* decisions. Proskauer's request relates to statements allegedly protected by the attorney-client privilege that were introduced into the litigation by Plaintiff, rather than Proskauer. Furthermore, Proskauer's request is narrowly tailored – only three paragraphs out of several hundred. Therefore, if constitutional analysis is applicable to the instant case, the result would be the same.

access.  *Id.*  Second, the court determines the weight of the presumption.  The weight of the

presumption is "governed by the role of the material at issue in the exercise of the Article III

judicial power and the resultant value of such information to those monitoring the federal

courts."  *Lugosch,* 435 F.3d at 119 (quoting *Amodeo II,* 71 F.3d at 1049).  The material at issue

"will fall somewhere on a continuum from matters that directly affect the adjudication to matters

that come within a court's purview solely to insure their irrelevance."  *Id.*  Finally, after the court

has determined the weight of the presumption of access, "the court must 'balance competing

considerations against it.'"  *Lugosch,* 435 F.3d at 120 (quoting *Amodeo II,* 71 F.3d at 1050); *see*

*also Standard Inv. Chartered Inc.*, 2007 WL 2790387, at *3.  These competing considerations

include, *inter alia*, "the privacy interests of those resisting disclosure."  *Lugosch,* 435 F.3d at 120

(quoting *Amodeo II*, 71 F.3d at 1050).

    The Court reviews Proskauer's request to seal portions of the PSAC in light of this three

step analysis.  First, the PSAC is clearly a judicial document.  As noted in Section II.A of this

Opinion, *supra*, Plaintiff's Motion to File a Proposed Second Amended Complaint is assessed

under Rule 12(b)(6).  Under Rule 12(b)(6), the Court assesses Plaintiff's claim by determining

whether Plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face."

*Bell Atl.*, 127 S. Ct. at 1974.  The 12(b)(6) motion depends entirely upon the legal sufficiency of

Plaintiff's pleadings.  *See Newman*, 103 F.3d at 662 ("In considering a motion to dismiss for

failure to state a claim under Fed.R.Civ.P. 12(b)(6), a district court must limit itself to facts

stated in the complaint or in documents attached to the complaint as exhibits or incorporated in

the complaint by reference." (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir.

1991)).  As a result, the Plaintiff's Proposed Second Amended Complaint must necessarily be a

judicial document – the Motion currently before the Court hinges on the Court's assessment of the adequacy of the allegations in that document.[32]

Second, the weight of that presumption should be considerable, for many of the same reasons just enumerated. The Motion currently before the Court pertains to the legal sufficiency of the document that Proskauer would like to seal: Plaintiff's Proposed Second Amended Complaint. As a result, public access to the PSAC is necessary to monitor the decision of the Court. Without access to the PSAC, the public would be unable to "assess the correctness of the judge's decision." *See Lugosch,* 435 F.3d at 120 (quotations omitted).

The final question is whether the "competing considerations" noted by Proskauer – attorney client privilege and unwarranted mudslinging – are sufficient to overcome the presumption against denying public access. The Court initally agrees with Proskauer in regard to its narrow request to seal the three statements in the PSAC that implicate only the attorney client privilege. *See Rapkin v. Rocque*, 87 F. Supp. 2d 140, 143 (D. Conn. 2000) ("We agree

---

[32]In *Standard Investment Chartered Inc*., the court held that "documents submitted in connection with a Rule 12(b)(6) motion cannot qualify as judicial." *See Standard Inv. Chartered, Inc.*, 2007 WL 2790387, at *6. The key language here is the phrase "in connection." Noting that a court is restricted in its ability to go outside the pleadings in assessing a Rule 12(b)(6) motion, Judge Kram held that documents submitted "in connection" with a 12(b)(6) motion are not judicial documents, as they cannot play any role in the court's deliberations. *Id.* (explaining that only documents that a court "could legitimately rely upon" qualify as judicial documents); *see also In re Policy Mgmt. Sys. Corp*., No. 94 Civ. 2254, 1995 WL 541623, at *4 (4th Cir. 1995) (same). If such documents were used by a court, the motion would no longer be a Rule 12(b)(6) motion for dismissal, but rather a Rule 56 motion for summary judgment. *See Standard Inv. Chartered, Inc.*, 2007 WL 2790387, at *6.

The issue before this Court is quite different: the Court is not assessing whether documents submitted "in connection" with a 12(b)(6) motion are judicial documents, but rather whether the Complaint itself is a judicial document. The answer hinges on whether the Court "could legitimately rely upon" the documents in forming its decision. *Id.* The Complaint (or in this case, the Proposed Second Amended Complaint) is the sort of document that the Court must rely upon, as it is the principal object of Plaintiff's Motion to Amend.

with Defendants that the public interest in preserving the attorney-client privilege ordinarily outweighs the presumption of access to judicial documents.); *see also Diversified Group, Inc. v. Daugerdas*, 304 F. Supp. 2d 507, 511 (S.D.N.Y. 2003) (noting that attorney-client privilege "would be sufficient to outweigh the presumption of access if the Summary Judgment Documents were replete with privileged attorney-client communications."). However, the Court does not agree in regard to the "mudslinging" claims. While the Second Circuit's analysis does invite consideration of broad privacy interests, and while the Court is troubled by some of the cavalier statements by Plaintiff's counsel about Defendants in this case, the statements in the PSAC do not "gratify private spite or promote public scandal" to such a degree that they overcome the presumption against sealing judicial records. *See Amodeo II*, 71 F.3d at 1051.

The portions of the PSAC identified by Proskauer as containing privileged communications, ¶¶ 64, 69 and 96, are to be sealed for ten days to allow Plaintiff to explain, in a letter no longer than three pages, why they should not be so sealed. In addition, this Opinion will remain sealed for ten days, after which it will be unsealed if there are no objections from the Parties. If the parties do have objections, they are instructed to identify for the Court any portions of the Opinion which should be kept under seal beyond the ten-day period. Any objections should be presented to the Court in a letter no longer than three pages. Failure to strictly honor these deadlines will result in a waiver of any objections the Party has to the sealing decisions outlined herein.

F.  Amendment of the Complaint

Plaintiff has thirty days to file a Second Amended Complaint consistent with this Opinion. This Second Amended Complaint will be the final version of the Complaint permitted

50

by the Court. Plaintiff already has attempted to amend his Complaint on five separate occasions – he will not receive a sixth opportunity. *See Dluhos v. Floating & Abandoned Vessel, Known as N.Y.*, 162 F.3d 63, 69 (2d Cir. 1998) (recognizing liberal standard for granting leave to amend, "[n]onetheless a motion to amend should be denied if there is an 'apparent or declared reason-such as undue delay, bad faith or dilatory motive ..., repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [or] futility of amendment.' " (quoting *Foman v. Davis*, 371 U.S. 178, 182, (1962))); *Chill v. General Electric Co.*, 101 F.3d 263, 272 (2d Cir. 1996) ( "[F]utility is a good reason to deny leave to amend." (quotations and citation omitted)); *Mackensworth v. S.S. American Merchant*, 28 F.3d 246, 251 (2d Cir. 1994) ("Although leave to amend shall be freely granted when justice requires, valid reasons for denying leave to amend include undue delay, bad faith or futility of the amendment." (citations omitted)). Indeed, counsel for Plaintiff has repeatedly mentioned her desire to move this case along. Further skirmishing over any additional amendments will only undermine that interest. In addition, Plaintiff will serve a copy of the Second Amended Complaint on the other Parties in this action prior to submitting the final version of the Complaint to the Court. The Parties will have 10 days to review the Second Amended Complaint for the presence of privileged material before filing by Plaintiff.

### III. Conclusion

For the reasons stated above, Plaintiff's Motion to File a Proposed Second Amended Complaint is GRANTED in part and DENIED in part. Plaintiff's claims for breach of fiduciary duty under Section 502 and Section 510 of ERISA against Fund Defendants and Proskauer are futile and may not go forward. In addition, all RICO and defamation claims against Defendants

51

are futile and may not go forward. The sole claim that may be added is Plaintiff's claim under

Section 510 of ERISA against Union Defendants.


SO ORDERED.

Dated:      November 8 , 2007
            New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE


* NOTE: The sole reason for the amendment of this Opinion and Order is to correct the numbering of the footnotes. The previous version featured an empty footnote 28, which has been removed in this version.

Service List:

Ruth M. Pollack, Esq.
1228 West Main St., P.O. Box 120
Riverhead, New York 11901
(516) 746-0146
Fax:  (516) 7146-8008
*Counsel for Plaintiff*

Kathleen M. McKenna, Esq.
Deidre A. Grossman, Esq.
Proskauer Rose LLP
1585 Broadway
New York, New York 10036
(212) 969-3006
Fax:  (212) 969-2900
*Counsel for Defendants Ishry Singh, Laborers-Employers Cooperation and Education Trust Fund, Mason Tenders District Council Trust Funds, Raymond Pocino, as a Trustee of the Mason Tenders District Council Trust Funds, and John Virga*

Samuel Rosenthal, Esq.
Curtis, Mallet-Prevost, Colt & Mosle, LLP
101 Park Ave.
New York, New York 10178
(212) 696-6000
Fax:  (917) 368-7340
*Counsel for Defendants Laborers International Union of North America and Raymond Pocino*

Terrence G. Reed, Esq.
Lankford, Coffield & Reed, PLLC
120 North St. Asaph St.
Alexandria, Virginia 22314
(202) 942-2204
Fax:  (703) 299-8876
*Counsel for Defendants Laborers International Union of North America and Raymond Pocino*